824 P.2d 841

The IDAHO FIRST NATIONAL BANK, and its successor in interest West One Bank, Idaho, N.A., Plaintiff–Appellant,

v.

BLISS VALLEY FOODS, INC., an Idaho corporation; Thomas G. Walker, Jr. and Donna I. Walker, husband and wife; Robert A. Erkins and Bernardine M. Erkins, husband and wife; Frederick L. Surbaugh and Carole W. Surbaugh, husband and wife; Rodney D. Swartling and Jean K. Swartling, husband and wife; Rex S. Leforgee and Cheryl E. Leforgee, husband and wife; Robert A. Ridgeway and Nancy N. Ridgeway, husband and wife; Robert J. Porter II and Karen L. Porter, husband and wife; Mark F. Grefenson and Hedwig Grefenson, husband and wife; Allan R. Frost and Frances M. Frost, husband and wife; Harry F. Brumbach, Jr. and Janice L. Brumbach, husband and wife; Dale D. Stukenholtz and Joyce E. Stukenholtz, husband and wife; Miles H. Humphrey and Margaret Humphrey, husband and wife; Samuel V. Jordan and Barbara Jordan, husband and wife; and Donnie B. McFadden, dba McFadden Family Investments, Defendants–Respondents.

Frederick L. SURBAUGH and Carole W. Surbaugh, husband and wife; Rodney D. Swartling and Jean K. Swartling, husband and wife; Rex S. Leforgee and Cheryl E. Leforgee, husband and wife; Robert A. Ridgeway and Nancy N. Ridgeway, husband and wife; Robert J. Porter II and Karen L. Porter, husband and wife; Mark F. Grefenson and Hedwig Grefenson, husband and wife; Allan R. Frost and Frances M. Frost, husband and wife; Harry F. Brumbach, Jr. and Janice L. Brumbach, husband and wife; Dale D. Stukenholtz and Joyce E. Stukenholtz, husband and wife; Miles

H. Humphrey and Margaret Humphrey, husband and wife; Samuel V. Jordan and Barbara Jordan, husband and wife; and Donnie B. McFadden, dba McFadden Family Investments, Counterclaimants–Respondents–Cross Appellants,

v.

The IDAHO FIRST NATIONAL BANK, and its successor in interest West One Bank, Idaho, N.A., Counterdefendant–Appellant–Cross Respondent.

Frederick L. SURBAUGH and Carole W. Surbaugh, as husband and wife, and as trustee for the Frederick L. Surbaugh Retirement Trust #50405; Rodney D. Swartling and Jean K. Swartling, as husband and wife, and as trustee for the Rodney D. Swartling Retirement Trust #50402; Rex S. Leforgee and Cheryl E. Leforgee, as husband and wife, and as trustee for the Rex S. Leforgee, CPA Chartered Pension Plan; Robert A. Ridgeway and Nancy N. Ridgeway, as husband and wife, and as trustee for the Robert A. Ridgeway, DDS, P.S., Pension Plan; Robert J. Porter II and Karen L. Porter, as husband and wife, and as trustee for the Robert J. Porter II Retirement Trust #50403; Mark F. Grefenson and Hedwig Grefenson, as husband and wife, and as the trustee for the Mark F. Grefenson Retirement Trust #50601; Allan R. Frost and Frances M. Frost, as husband and wife, and as trustee for the Allan R. Frost Retirement Trust #50701; Harry F. Brumbach, Jr. and Janice L. Brumbach, as husband and wife, and as trustee for the Harry F. Brumbach, Jr. Retirement Trust #51101; Dale D. Stukenholtz and Joyce E. Stukenholtz, as husband and wife, and as trustee for the Dale D. Stukenholtz Retirement Trust #52201; Miles H. Humphrey and Margaret Humphrey, husband and wife; Samuel V. Jordan and Barbara Jordan, as hus-

band and wife, and as trustee for the Samuel V. Jordan Retirement Trust #51501; and Donnie B. McFadden, dba McFadden Family Investments, Counterclaimants–Respondents–Cross Appellants,

v.

The IDAHO FIRST NATIONAL BANK, and its successor in interest West One Bank, Idaho, N.A., Counterdefendant–Appellant–Cross Respondent.

BLISS VALLEY FOODS, INC., an Idaho corporation; and Robert A. Erkins and Bernardine M. Erkins, husband and wife, Counterclaimants–Respondents,

v.

The IDAHO FIRST NATIONAL BANK, and its successor in interest West One Bank, Idaho, N.A., Counterdefendant–Appellant.

Thomas G. WALKER, Jr. and Donna I. Walker, husband and wife, Counterclaimants–Respondents–Cross Appellants,

v.

The IDAHO FIRST NATIONAL BANK, and its successor in interest West One Bank, Idaho, N.A., Counterdefendant–Appellant–Cross Respondent.

No. 18230.

Supreme Court of Idaho,
Boise.

Sept. 27, 1991.

On Denial of Rehearing Feb. 3, 1992.

268

Holland & Hart, Denver, Colo., and Boise, for plaintiff-appellant. William C. McClearn argued.

Skinner, Fawcett & Mauk, Boise, for defendant-respondent Bliss Valley Foods. William L. Mauk argued.

Chandler, Dillion & Allyn, Boise, for defendant-respondent Erkins. Thomas B. Chandler argued.

Cosho, Humphrey, Greener & Welsh, Boise, for defendants-respondents Walkers. Richard H. Greener argued.

Elam, Burke & Boyd, Boise, for defendants-respondents Surbaugh through McFadden (limited guarantors). Bobbi K. Dominick argued.

Hall, Farley, Oberrecht & Blanton, Boise, for amicus curiae Idaho Bankers Ass'n. Richard E. Hall argued.

BAKES, Chief Justice.

Idaho First National Bank (Idaho First) brought this foreclosure action to collect approximately $3.2 million owing pursuant to notes and real and personal property security instruments on a loan to Bliss Valley Foods, Inc. (Bliss Valley). The bank also sued as obligors and guarantors the general and limited partners of Bliss Valley.[1]

Bliss Valley, Robert Erkins and Thomas Walker, the general partners and primary guarantors of the loan, and twenty-three limited partners who were also limited obligors and guarantors[2] denied liability and raised a number of affirmative defenses and counterclaims. At the conclusion of trial, the jury entered a $5.7 million verdict against Idaho First on several of the borrowers' counterclaims. The trial court entered judgment on the verdict, released the borrowers from their obligations to repay any of the $3.2 million loan, and awarded the borrowers $2.7 million in attorney fees and costs. The trial court also denied Idaho First's motion for judgment notwithstanding the verdict, remittitur and new trial. Idaho First now appeals the trial court's decision. The limited partners and Walker have filed cross appeals.

## I. FACTS

In 1984, Robert Erkins, an Idaho businessman, and Thomas Walker, a Twin Falls tax attorney, formed a limited partnership to produce and market pleurotus mushrooms on Erkins' ranch outside of Bliss, Idaho. Erkins owned White Arrow Ranch, which had a large geothermal spring on it and, for some time prior to forming the limited partnership with Thomas Walker, had been researching and seeking ways to use the geothermal spring to develop a mushroom growing operation. He had also been seeking financing from several sources, but ultimately opted for a limited partnership in which he and Thomas Walker were the general partners and several private professional and business people were limited partners. They developed a business plan, private placement memoranda, and subscription agreement and began soliciting funds from private investors and several lending institutions over a period of several months. The twenty-three Twin Falls area residents invested, as limited partners, approximately $1.1 million in the business.[3] Walker ultimately negotiated a $3.2 million loan from Idaho First National Bank.

Under the terms of the loan agreement, which was finally executed on August 24, 1984, Bliss Valley could borrow up to $3.15 million from Idaho First before July 1, 1985, but the partners' own investments, approximately $1.1 million, were to be used before any draws were made on the Idaho First loan. Bliss Valley was required to begin making quarterly payments on April 1, 1985, and to maintain a current debt-to-equity ratio of 1.75:1 and working capital of $750,000 beginning October 1, 1984. The loan provided that default could occur upon several conditions: nonpayment of any installment; breach of warranty; failure to comply with any condition, covenant or agreement contained in the loan, unless

---

**1.** Originally, Bliss Valley was a limited partnership referred to as Geo–Pleurotus Growers Limited Partnership. However, when the partnership later incorporated, the name was changed to Bliss Valley Foods, Inc., and the loan documents were re-executed. We refer to the company throughout this opinion as "Bliss Valley."

**2.** These four parties—Bliss Valley, the Walkers, the Erkins, and the twenty-three limited partners—will be referred to throughout this opinion as "borrowers" unless the context requires

that one or more parties be referred to specifically.

**3.** The twenty-three limited partners consisted of eleven professional or business people and their spouses, and an individual, Donnie McFadden. All but McFadden were or had been clients of attorney Walker and were members of one or more other business ventures with Walker, as more particularly described in Part IV, *infra.*

cured within 60 days of written notice of default; or if Bliss Valley's financial circumstances or the value of the security was "substantially affected in an adverse manner." The loan document specifically provided that "[t]his Agreement contains the entire agreement between Lender, Borrower and Guarantors with respect to the subject matter hereof and supersedes and cancels any prior understandings and agreements between Lender, Borrower and Guarantors with respect to the subject matter hereof." [4]

Both Walker and Erkins signed the loan agreement as the general partners of the limited partnership, pursuant to authority vested in them by the limited partnership agreement and other partnership documents. In addition to the loan agreement, Erkins and Walker, on behalf of the partnership, and individually, signed notes and gave the bank a security interest in a portion of Erkins' real property on which the business was to be located and on the equipment owned by Bliss Valley. Additionally, Erkins and Walker both signed general guaranties, and each limited partner signed an assumption of liability agreement which provided that (1) each was liable for three times his or her initial limited partnership investment; (2) the obligations of each limited partner were separate from that of the partnership; and (3) the bank could bring a separate action against any limited partner regardless of whether or not it also brought an action against the partnership. [5]

Bliss Valley incorporated on July 3, 1985. This was contemplated in the original loan agreement and, pursuant to the loan agreement, Idaho First was entitled to seek new loan documents reflecting the changed status of the company. The bank asked all the limited partners to sign amended assumption of liability agreements, which they did. The bank later asked the limited partners to sign another "form guaranty," which the bank stated was needed for its own internal audits, and some, but not all, limited partners complied with this request.

Once the parties signed the loan agreement, assumption of liability agreements, and guaranties, construction on the project began in August of 1984, with the partners' contributions being expended first. Kamal Hyder was hired as the general manager for the project, and Hyder, Robert Erkins, and his son-in-law, John Burk, were in charge of the day-to-day operations. Randy Erkins, the son of respondent Robert Erkins, was also an employee involved in sales and in providing the growing medium for the mushrooms.

The business encountered various problems from the onset. The causes of many of the problems were disputed by the parties and constituted a major part of the trial of this case. Negotiations on the terms of the loan agreement had extended later into the summer of 1984 than had been anticipated by the borrowers, so reconstruction on the existing greenhouses and the construction of the other improvements began in late August, 1984, instead of June, 1984, as the business plan had proposed. An unusually cold winter in 1984–85 further delayed construction, which was not completed until spring of 1985.

Throughout the spring and summer of 1985, Hyder, Robert Erkins and John Burk struggled to complete the initial phase of the construction (Phase I) and to make the business profitable, but they ran into sever-

---

**4.** Erkins testified that there were no side agreements with the bank. However, Walker was permitted to testify, with regard to the $750,000 working capital requirement, that during the negotiations prior to signing the loan agreement "he [Donald Chance] and I reached an agreement that we would go ahead and sign the loan agreement in its present form with that provision in it and that I would make application for a waiver and that the bank would grant it, so that it was a means to overcome this particular hurdle."

**5.** The assumption of liability agreement was proposed and prepared by Walker, according to his testimony, "to ensure that all of the limited partners would be able to realize the tax savings or the tax advantages which [he] had previously told them that they would be able to get or could get out of this transaction." "The only reason I was suggesting that they sign an assumption of liabilities agreement was for the tax purposes, not for any other purposes."

al problems, including personnel difficulties among themselves and other employees, production problems, growing concern from the limited partners and from the bank regarding the viability of the business and, subsequently, a claimed reluctance of the bank to advance additional funds under the loan agreement, claiming the borrowers were in default of the terms. The production and sales of mushrooms were not meeting the original projections set out in the business plan, which caused the company difficulties in meeting its repayment obligations.

These problems and delays prompted Bliss Valley to request the bank to postpone or waive various requirements of the loan agreement. In late 1984, Bliss Valley requested a waiver of the working capital covenants and the first principal payment due on April 1, 1985. Idaho First agreed to waive the working capital covenant, but did not extend the April 1 due date for the first principal payment, which Bliss Valley made. On May 20, 1985, Hyder wrote to Idaho First requesting that the principal payments be rescheduled to begin on April 1, 1986, instead of April 1, 1985, and that the final draw date on the loan be extended from July 1, 1985, to December 31, 1985. Idaho First agreed to extend the draw date as requested, but it only postponed the quarterly principal payment due on July 1, 1985, requiring all remaining principal payments to be made. Bill Babcock, the Idaho First official in charge of overseeing the loan to Bliss Valley, suggested to his superiors that the working capital requirement be extended through November 30, 1985. However, in response, Babcock's superior, Donald Chance, instructed him to "wait 'til default and customer request for waiver, then analyze situation."

Finally, because of dismal financial projections and the fact that Bliss Valley had not kept up with its working capital and current ratio requirements, Idaho First gave Bliss Valley written notice of default on October 15, 1985, which, under the terms of the loan agreement, Bliss Valley had sixty days to cure. Bliss Valley replied, requesting Idaho First to forbear from terminating the loan commitment, which expired on December 31, 1985. In April, 1986, Bliss Valley and the bank entered into the first of a series of written credit extension agreements, in which the bank agreed to defer principal payments and extended the time for repayment of the loan until June 1, 1986, in consideration for the borrowers acknowledging the validity of the debt and re-promising to pay the debt and keep the interest payments current. Between January, 1986 and January, 1987, Bliss Valley sought and Idaho First granted five more similar credit extensions. Bliss Valley complied with the credit extension agreements until January, 1987, when it failed to make any payment on the loan. Idaho First then brought this action against all borrowers on March 11, 1987, to foreclose on the collateral securing the debt and to enforce the loan agreement, promissory note, assumption of liability agreements, guaranties, and credit extension agreements.

The borrowers denied liability on any of the loan documents, raising several affirmative defenses. They also filed counterclaims and amended counterclaims against Idaho First, including a claim of RICO violations, breach of the duty of good faith and fair dealing, breach of fiduciary duty, breach of the tort of bad faith, fraud, negligent misrepresentation, tortious interference with Robert Erkins' contractual relations, and a claim of defamation of Robert Erkins, which was raised for the first time in the amended counterclaim.

Before trial, and over the bank's objections, the trial court realigned the parties, designating the borrowers as plaintiffs and Idaho First as defendant. As a result the case proceeded essentially as a tort case against the bank, rather than as a foreclosure proceeding against the borrowers. After a thirteen week trial, the jury returned its verdict on June 16, 1989. The jury found that Idaho First had not committed fraud or a RICO violation, but on the remaining counterclaims, it returned a $5.7 million verdict against Idaho First. Specifically, the jury found that Idaho First committed the tort of bad faith with respect to all borrowers, breached a fiduciary

duty owed to Bliss Valley, the Erkins and the limited partners, and breached the covenant of good faith and fair dealing owed to Bliss Valley, the Erkins, Walkers, and the limited partners. The jury also found that the bank defamed Robert Erkins and tortiously interfered with his contractual relations. Finally, the jury awarded punitive damages to each of the limited guarantors. The $5.7 million award included $3.1 million to Bliss Valley for the bad faith tort, approximately $2 million to the Erkins, $137,000 to the Walkers, and approximately $360,000 to the limited guarantors.

As to the equitable issues in the case, involving the bank's foreclosure claim and the defenses filed by the borrowers, the court concluded that the jury's finding and the verdict were binding on the court in its determination of the equitable issues, including the bank's claim on the foreclosure action. Without making any findings of fact or conclusions of law, the court denied the bank's foreclosure claim and released the borrowers from all obligations to repay the principal and interest on the $3.2 million loan obtained from the bank. The court entered judgment on the jury's verdict in favor of the borrowers for the total sum of $5,598,000.00. The court then awarded all borrowers' attorney fees and costs totalling $2,683,547.33.

Idaho First filed several post-trial motions, including motions for new trial, remittitur, and JNOV. In its memorandum decision denying the motions, the trial court held:

> The evidence was conflicting throughout the trial and the position of each party was placed before the jury. From my point of observation the jury could as easily have come back with a verdict for "the Bank". If this had been a court trial, I would have found for "the Bank" based upon my own findings of fact from my observation of the evidence and my determination of credibility of witnesses. However, I cannot say that the jury's verdict was not supported by substantial evidence, nor that the verdict was against the weight of the evidence. The evidence in this case, on both sides, was voluminous and much of it was in the form of expert opinion. The expert opinions were hotly disputed, as was much of the other evidence. The decision, whether by verdict of the jury or finding of fact by the Court, was dependent upon whose expert and whose evidence was believed. Reasonable men or women could differ as to which side was entitled to the verdict or to the Court's decision. I yield to the combined wisdom of the twelve jurors and hold that the Judgment based upon the jury's verdict should stand.

The bank appeals from the judgment and rulings on the post-trial motions, raising numerous issues, including the following:

(1) Did the trial court err in submitting to the jury the issue of bad faith tort?
(a) Did the trial court err in admitting irrelevant and highly prejudicial evidence based on the bad faith tort claim?

(2) Did the trial court err in submitting to the jury the borrowers' claim that the bank owed the borrowers a fiduciary duty?

(3) Did Erkins have a viable claim for defamation, and was that claim barred by the statute of limitations?

(4) Did the trial court err in submitting to the jury Erkins' claim that the bank tortiously interfered with his contractual relations and prospective economic advantage, and did the trial court improperly instruct the jury on this claim?

(5) Did the trial court err in submitting to the jury the borrowers' claim of punitive damages?

(6) Did the trial court improperly instruct the jury regarding the borrowers' claim that the bank breached its duty of good faith and fair dealing?

(7) Did the trial court err in entering judgment for the limited partners who did not testify at trial?

(8) Did the trial court err by realigning the parties before trial?

(9) Did the trial court err in awarding the borrowers' attorney fees and costs?

On cross appeal, the limited partners raise the following issues:

(1) Did the trial court err in failing to submit to the jury the limited partners' claim of the Bank's negligent misrepresentation?

(2) Did the trial court err by not allowing the limited partners to present a defense of a good faith duty on the part of the Bank to provide information?

(3) Did the trial court err in not submitting to the jury a breach of fiduciary duty claim on behalf of the Walkers?

JOHNSON and BOYLE, JJ., and SCHROEDER and McKEE, JJ. Pro Tem., concur.

## II

## FORECLOSURE PROCEDURE

■ We commence our analysis by considering the bank's claims relating to the foreclosure proceeding. The foreclosure of a note and mortgage is an equitable proceeding. *Steed v. Young,* 115 Idaho 247, 766 P.2d 717 (1988); *Federal Land Bank of Spokane v. Parsons,* 116 Idaho 545, 777 P.2d 1218 (Ct.App.1989); *Rees v. Gorham,* 30 Idaho 207, 212, 164 P. 88, 89 (1917) ("[T]he rule is too well settled to require the citation of authorities, that a mortgage foreclosure is an equitable proceeding, in which neither party is entitled to a jury trial."). Thus the bank's claim of foreclosure of its loan documents and security, and the defenses raised by the borrowers, were part of the equitable foreclosure proceedings.

■ Because the bank's complaint "invoked the equitable jurisdiction of the district court, the jury's verdict and findings would be advisory only, and under I.R.C.P. 52(a) the judge has the responsibility of making the ultimate findings and decision

in the case...." *Carpenter v. Double R Cattle Co.,* 108 Idaho 602, 606, 701 P.2d 222, 226 (1985). I.R.C.P. 52(a) reads in part: "In all actions tried upon the facts without a jury *or with an advisory jury,* the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of an appropriate judgment...." (Emphasis added.) Thus, with regard to the bank's foreclosure of its notes and security, and with regard to the borrowers' defenses to that foreclosure, the trial court was obligated to make its own findings of fact, conclusions of law and decision. I.R.C.P. 52(a); *Carpenter v. Double R Cattle Co., supra.*

However, the trial court did not make any findings of fact. In his decision on the post-trial motions the trial court stated that, "If this had been a court trial, I would have found for 'the Bank' based upon my own findings of fact from my own observation of the evidence and my determination of credibility of witnesses." The trial court nevertheless entered a judgment based solely on the verdict of the jury, without making its own findings of fact and conclusions of law based on its own evaluation of the evidence. In failing to make its own findings, the trial court erred. I.R.C.P. 52(a) requires the trial court in a foreclosure proceeding, even with an advisory jury, to make its own findings of fact and conclusions of law in accordance with his own "observation of the evidence and ... determination of credibility of witnesses." *Carpenter v. Double R Cattle Co., supra.* For that reason alone, the judgment of the trial court would have to be vacated and the case remanded to the trial court to make the necessary findings of fact required by Rule 52(a). *Carpenter v. Double R Cattle Co., supra; Owen v. Boydstun,* 102 Idaho 31, 624 P.2d 413 (1981).[6]

---

**6.** In addition to the absence of findings on the foreclosure portion of the case, the jury verdict on the counterclaim issues appears to have created a double recovery for the borrowers. Not only were the borrowers given damages of $5.7 million, the trial court's judgment relieved the borrowers of their admitted obligation to the bank to repay the $3.2 million loan. There appears to be, to some extent, a duplication in

the awards on the counterclaim issues in favor of the borrowers and also relieving the borrowers of their obligation to repay the $3.2 million loan. Having concluded that a new trial is necessary, we need not resolve the extent to which the existing judgment of the court resulted in a double recovery, but merely note that on retrial the trial court should be cognizant of the potential for double recovery where the coun-

However, in view of our disposition of the remaining issues in Parts III through X, in which we conclude that a new trial is necessary in this case, the trial court's findings of fact and conclusions of law should be based upon the evidence and proceedings at the new trial.

BOYLE, J., and SCHROEDER and McKEE, JJ. Pro Tem., concur.

## III

## BAD FAITH TORT

■ Regarding the borrowers' tort claim of bad faith, when this case went to trial, the trial court did not have the benefit of our recent decision in *Black Canyon Racquetball Club, Inc. v. Idaho First National Bank*, 119 Idaho 171, 804 P.2d 900 (1991), in which we rejected the tort of bad faith in the commercial lending context. In *Black Canyon*, a bank customer brought an action against the bank alleging, among other things, that the bank had committed the tort of bad faith by breaching an alleged oral contract to make a commercial loan. In *Black Canyon*, this Court distinguished the borrower-lender relationship from the insured-insurer relationship in *White v. Unigard*, 112 Idaho 94, 730 P.2d 1014 (1986), in which this Court adopted the tort of bad faith in the insurance context. The Court in *Black Canyon* stated:

> While this Court in *Unigard* did hold that a duty exists in an insurer-insured relationship, the breach of which can result in an action for bad faith, the rationale behind that adoption in *Unigard* was based upon the "special relationship which exists between insurer and insured." 112 Idaho at 99 [730 P.2d 1014]. The Court in *Unigard* went on to point out "that it is the unique 'personal' (non-commercial) nature of insurance contracts which justifies the imposition of the duty of good faith and fair dealing." *Id.* The reasons stated in *Unigard* for

creating a duty by an insurer to an insured, the breach of which can result in the tort of "bad faith breach of an insurance contract," do not apply in a debtor-credit relationship. The *Unigard* opinion noted that insurance contracts are invariably fixed, standardized contracts whose terms are not negotiated and are executed in a non-commercial setting. The insurer prepares the insurance contract, while the insured seldom, if ever, reads—much less understands—the terms of the agreement.

> In contrast, the alleged bank loan involved in this case was a commercial transaction between a bank and a business borrower. The bank loan under negotiation was not an "invariably fixed, standardized contract ... in a non-commercial setting," which was the basis for the Court's ruling in *Unigard*. Rather, the transaction here was a commercial one, which would have created a debtor-creditor relationship, for which both the terms and the security for the loan were under negotiation. Accordingly, the policy reasons for establishment of the tort of "bad faith breach of an insurance contract" in *Unigard* is not applicable here.

119 Idaho at 176, 804 P.2d at 905.

The borrowers make several arguments in support of their claim that *Black Canyon* ought not to be applied to this case and that the trial court correctly submitted the bad faith tort issue to the jury. The crux of each of the borrowers' arguments is that the circumstances surrounding commercial loan transactions are similar to those in an insurer-insured relationship. According to the borrowers, both types of transactions usually involve performance of a public service, an adhesion contract, and disparity in bargaining power between the lender and borrower, all of which create a "special relationship" such as the Court found in *Unigard*. The Walkers further argue that *Black Canyon* does not apply because, since this Court ultimately held in that case that there was no valid

terclaims are based upon the same operative

facts as affirmative defenses.

contract between the parties, the "attempt to distinguish *White* constitutes dictum which is not binding in this case" where there is a valid contract between the parties.[7]

We have reviewed the arguments of the borrowers in support of their bad faith tort claim, and the cases cited by them, and are nevertheless convinced that our decision in *Black Canyon* was correct. The bad faith tort, which had its genesis in the peculiar nature of the first-party insurance contract, as explained in *White v. Unigard*, has no application outside the first-party insurance context, as we clearly spelled out in the *Black Canyon* case. We adhere to our decision in *Black Canyon*.[8]

7. The limited partners further attempt to distinguish *Black Canyon* by claiming that it dealt with a .lender-borrower relationship, while in their case against the bank, the relationship is that of lender and guarantor. However, their attempt to distinguish *Black Canyon* is not persuasive. These twenty-three people were not only guarantors, but also were limited partners in the Geo–Pleurotus partnership. The Idaho First loan was made to the partnership, so the limited partners are also borrowers, and their additional status as guarantors does not distinguish them from the borrowers in *Black Canyon*. In any event, our disposition of the bad faith tort issue is based upon much broader policy considerations.

8. Much of the evidence in this three and one-half month trial was admitted in support of the bad faith tort claim. Evidence which the trial court had earlier ruled would be inadmissible was nevertheless admitted based upon the trial court's ruling that it was relevant to the bad faith tort claim. For example, the trial court admitted evidence of settlement negotiations between the parties, based on the claim that the bank negotiated the settlement in bad faith and therefore that evidence was relevant to the bad faith tort claim. The settlement negotiations related to work-out negotiations, which were conducted between principals of Bliss Valley and officers of the bank, related to the infusion of additional equity capital and additional loan capital, as well as management matters. The trial court had originally ruled, as a result of a motion *in limine*, that "[n]egotiations, discussions, agreements or stipulations, if they relate to settlement and compromise, for sure they're not going to be admissible." Furthermore, the parties had entered into a written stipulation filed with the court on February 25, 1988, in which they recited that the bank and Bliss Valley intended to enter into settlement negotiations, and the parties expressly agreed that their conduct or statements, and any evidence fur-

JOHNSON and BOYLE, JJ., and SCHROEDER and McKEE, JJ. Pro Tem., concur.

## IV

### FIDUCIARY DUTY

We next consider whether the trial court erred in submitting to the jury the borrowers' claim that Idaho First owed and breached a fiduciary duty to them. The trial court submitted the breach of fiduciary duty claim on behalf of all of the borrowers except Walker, who was one of the two general partners and an experienced attorney and who negotiated the loan with the Bank on behalf of the partnership. In dismissing Walker's claim of breach of

nished in the course of the settlement negotiations, "shall not be admissible for *any* reason or in *any* manner." The court on February 22, 1988, approved the stipulation and stated that the stipulation "constitutes an order of this court." Nevertheless, the court permitted the borrowers to introduce evidence of these settlement negotiations on the theory that the settlement negotiations were evidence supporting the borrowers' bad faith claims. In spite of the stipulation and the court's prior orders when the evidence was offered, the court ruled that, "Even though compromises are normally not admissible, that, with respect to the issues of this case of bad faith, I feel that it does remain an issue." The trial court's change in position resulted from the court's view of the law, incorporated into the bad faith Instruction No. 53, that any conduct on the bank's part which was "intentionally unreasonable" constituted the tort of bad faith. The trial court concluded that the bank's work-out negotiations were "intentionally unreasonable."

I.R.E. 408 specifically precludes the admission of settlement negotiations such as the work-out proposals which were discussed. Furthermore, by our reversal and rejection of the bad faith tort, we have rejected the trial court's rationale for the admission of this evidence, which, under Evidence Rule 408, was clearly inadmissible anyway. In *Ross v. Coleman*, 114 Idaho 817, 761 P.2d 1169 (1988), this Court held that there was no duty on a party to conduct reasonable settlement negotiations and "no authority to impose sanctions for 'bad faith' [settlement] bargaining." 114 Idaho at 836, 761 P.2d at 1188. *See also Turner v. Willis*, 119 Idaho 1023, 812 P.2d 737 (1991). The admission of evidence of the settlement negotiations, and the admission of other evidence which the trial court ruled was admissible based solely upon the bad faith tort theory, will not be admissible on retrial in view of our rejection of the bad faith tort.

fiduciary duty against the Bank, the trial court stated, "Mr. Walker was an attorney who, the evidence conclusively showed, had knowledge superior to that of plaintiffs' representative as to all matters with which he dealt with representatives of Idaho First."

The bank asserts that our recent decision in *Black Canyon Racquetball Club v. First National Bank*, 119 Idaho 171, 804 P.2d 900 (1991), resolves the issue and requires reversal on the trial court's submission of the breach of fiduciary duty claim to the jury in this case. Alternatively, the bank argues that the same rationale which caused the trial court to refuse to submit Walker's claim of breach of fiduciary relationship applies to Bliss Valley and the other members of the partnership, since Walker was the general partner who was authorized to negotiate on behalf of the partnership and who actually drafted the loan agreement, assumption of liability agreement, and all the other documents on behalf of the partnership.

In *Black Canyon, supra,* we held that, generally, the relationship between a bank lender and borrower was a debtor-creditor relationship, not a fiduciary relationship, stating:

> "We have been unable to locate any case in which a fiduciary relationship was held to arise solely through a longstanding creditor-debtor relationship or prior dealings between the customer and the bank." ... The rule expressed in the above cases holds that the relationship in a lender-borrower situation is a debtor-creditor relationship, and not a fiduciary relationship.

119 Idaho at 176, 804 P.2d at 905 (citing *Dugan v. First National Bank of Wichita*, 227 Kan. 201, 606 P.2d 1009, 1015 (1980). *See also, Peterson v. Idaho First National Bank*, 83 Idaho 578, 585, 367 P.2d 284, 291 (1961) ("It is generally stated that the relationship between a bank and its general depositor is that of debtor and creditor"); *Meyer v. Idaho First National Bank*, 96 Idaho 208, 525 P.2d 990 (1974).

Notwithstanding our holding in *Black Canyon*, the borrowers, while acknowl-edging that a fiduciary relationship will not "arise solely through" a borrower-lender relationship, cite to cases from other jurisdictions which hold that there are some instances in which a fiduciary relationship may arise between a lender and borrower. *See, e.g., Union State Bank v. Woell*, 434 N.W.2d 712 (N.D.1989); *Deist v. Wachholz*, 208 Mont. 207, 678 P.2d 188 (1984); *Denison State Bank v. Madeira*, 230 Kan. 684, 640 P.2d 1235 (1982); *Dolton v. Capitol Federal Sav. & Loan Ass'n.*, 642 P.2d 21 (Colo.App.1981); *Pigg v. Robertson*, 549 S.W.2d 597 (Mo.App.1977); *Klein v. First Edina Nat'l. Bank*, 293 Minn. 418, 196 N.W.2d 619 (1972). In the *Black Canyon* case we reviewed those or similar cases, but nevertheless chose to reject the claim of a fiduciary relationship.

In the recent Kansas case, *Denison State Bank v. Madeira,* 230 Kan. 684, 640 P.2d 1235 (1982), the defendants invested in a retail automobile dealership and had sought financing through a bank, which had also provided financing to the dealership owner who was the seller. When the defendants defaulted on the loan, the bank sued to recover on the promissory notes. The defendants counterclaimed, alleging that the bank breached the fiduciary duty it owed to them by failing to fully disclose the dealership owner's financial problems and financial involvement with the bank. In holding that the bank owed no fiduciary duty to the defendants, the Supreme Court of Kansas explained the characteristics of a fiduciary duty as follows:

> A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* <u>A fiduciary is a person with a duty to</u> *act primarily for the benefit of another.* A fiduciary is in a position to have and exercise, and does *have and exercise influence over another.* A fiduciary relationship implies a condition of *superiority of one of the parties over the other.* <u>Generally, in a fiduciary relationship, the property,</u> interest or authority of the other is *placed in the charge of the fiduciary....*

640 P.2d at 1241–42 (citations omitted, italics in original, emphasis added).

The South Carolina Supreme Court recently defined a fiduciary duty as follows:

The term fiduciary implies that one party is in a superior position to the other and that such a position enables him to exercise influence over one who reposes special trust and confidence in him.... As a general rule, mere respect for another's judgment or trust in this character is usually not sufficient to establish such a relationship. The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party.

*Burwell v. South Carolina Nat. Bank*, 288 S.C. 34, 340 S.E.2d 786, 790 (1986) (citations omitted, emphasis added). Applying this standard, the *Burwell* court held that a borrower-lender arrangement was not a fiduciary relationship, concluding:

If [the customer] reposed a special trust in [the bank officer], there is no evidence that [the bank officer] was aware of it. Each party was cognizant of the tenuous financial position of the company ... when the documents were signed. The fact that [the customer] bargained with [the bank officer] before he signed the documents indicates that [the customer] was aware that the parties were dealing at arms length. He could not reasonably have believed that [the bank officer] was acting on his behalf instead on behalf of [the bank].

340 S.E.2d at 790.

In *Klein v. First Edina Natl. Bank*, 293 Minn. 418, 196 N.W.2d 619 (1972), the court stated:

We believe the correct rule to be that when a bank transacts business with a depositor or other customer, it has no special duty to counsel the customer and inform him of every material fact relating to the transaction—including the bank's motive, if material, for participating in the transaction—unless special circumstances exist, such as where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him.

196 N.W.2d at 623.

The foregoing authorities are consistent with our decision in *Black Canyon* that a borrower-lender situation does not create a fiduciary relationship. From a review of the entire evidentiary record we conclude that this case is controlled by our *Black Canyon* case and that the trial court erred in submitting the breach of fiduciary duty claim to the jury.

■ Robert Erkins and his wife were the owners of the White Arrow Ranch, north of Bliss, Idaho, which contained a geothermal spring. Erkins had, for several years, discussed with various individuals how to capitalize on the geothermal energy potential of the White Arrow Ranch. Among the uses he considered was a mushroom growing operation. Erkins had discussed the growing of mushrooms with several individuals knowledgeable in the field, and the discussions had progressed to the point where he was contacting potential sources of capital to finance the mushroom growing operation. He contacted Mr. Miller, vice-president of the Idaho First National Bank, with whom Erkins had discussions with regard to a potential joint venture between Idaho First National Bank and Erkins in a mushroom growing project. During the course of those discussions, Miller suggested to Erkins that, because of the large capital demands of such a project, and because of his age, Erkins might not want to commit all of his capital resources ("put all of your eggs in one basket") in such a project, and that he ought to consider forming a limited partnership to bring in other equity capital so as to spread the risks which were inherent in such an untried venture. Based upon Miller's suggestion, Erkins testified that he and his wife concluded that "we would not accept Idaho First National Bank's very nice proposal" for a joint venture and decided that he would try to raise capital through use of a limited partnership. In December of 1983, he contacted Thomas Walker, a Twin Falls attorney experienced in putting together

venture capital arrangements for tax and other profit reasons. Walker responded positively to Erkins' proposal, stating, according to Erkins, that, "We would really like to look at the idea that you have and see if *our group* can do something under a limited partnership arrangement." (Emphasis added.) Erkins testified that when Miller recommended that he look at a limited partnership, and "when Tom Walker comes along and says he would like to look at going into a limited partnership, I had crossed the bridge already. And my mind says to me, let's take a look at this and see what a limited partnership would do."

Erkins negotiated with Walker, which resulted in their forming a limited partnership, with the two of them as general partners, to raise the necessary venture capital required in order to induce a lending institution to provide loans to the mushroom growing operation. The plan called for the partnership to contribute $1.1 million, with approximately another $3 million to be raised by bank loans.

Walker was an attorney specializing in tax and other venture capital raising companies and was involved in numerous limited partnerships and other ventures. By referring to "our group" in the December, 1983, conversation with Erkins, Walker was apparently referring to a company owned by him called Professional/Executive Leasing, a "personnel leasing company" which employed all of the limited partners who ultimately invested in the Bliss Valley mushroom operation, except Donnie McFadden. Professional/Executive Leasing was an entity formed for tax reduction purposes in which each of the participants (the twenty-two limited partners in the Bliss Valley venture) were employed and which in turn leased their services back to their professional practices to maximize their tax benefits by way of individual retirement plans, etc. A substantial number of the Bliss Valley limited partners were involved with Walker in other ventures besides the Professional/Executive Leasing Company, some of them in as many as five ventures. Both Walker and Erkins testified that in the preparation of the documentation with regard to the loan from Idaho

First National Bank, Walker was representing Bliss Valley, Erkins, and the limited partners.

In the limited partnership, Walker and Erkins were the general partners, and the partnership agreement specifically authorized them to conduct the business of the partnership and to do all things necessary to carry out the purposes of the partnership. The partnership agreement expressly provided that the general partners, Erkins and Walker, owed a fiduciary duty to the limited partners. None of the loan documentation states that the bank owed a fiduciary obligation toward the borrowers.

One of the purposes of the limited partnership was to provide a tax shelter, *i.e.*, a substantial tax loss write-off during the initial years of the operation for the partners. In order to accomplish this, according to Walker's testimony, the Internal Revenue Code and regulations required that the limited partners guarantee and be at risk for at least three times the amount of their investment in the limited partnership. To ensure compliance with I.R.S. regulations, Walker prepared all the loan documents, including the assumption of liability agreement which obligated each limited partner to the bank for three times his or her investment in the limited partnership.

Walker also prepared the business plan for the limited partnership and submitted it to several lending institutions for possible loans, ultimately settling on Idaho First National Bank because of its previously expressed support for the project. The limited partnership interests which the partnership was selling were not to be registered as a security with the Idaho Department of Finance, but were to be a private offering. Consequently, Walker prepared a document entitled "Private Placement Memorandum," which set out the provisions of the business plan, the limited partnership, and which contained financial statements and all other facts relevant to the project. These private placement memoranda were prepared separately for each particular individual whom Walker sought to solicit, which included for the most part

those who ultimately became limited partners.[9]

Walker sent letters to approximately twelve individuals, inviting them to a meeting on May 12, 1984, at the Holiday Inn in Twin Falls, where the business plan was discussed with them by both Erkins and Walker, and each was, or had been, given the private placement memorandum concerning the limited partnership offering.[10] As a result of the May 12th meeting, many of the attendees signed limited partnership subscription agreements agreeing to enter the partnership and contribute their capital. Three did not, including Babcock. Later, the remainder of the limited partners who ultimately joined the Bliss Valley limited partnership received their private placement memorandum from Walker and signed subscription agreements, according to Walker's testimony. In the subscription agreement, a copy of which is attached to this opinion as Appendix A, each subscriber warranted that, "The undersigned has received the [private placement] Memorandum, and has carefully reviewed the Part-

nership Agreement and the Memorandum, and has relied in making this investment only on the information contained therein, information otherwise provided to him in writing by the General Partners or information from books and records of the General Partners." By placing that warranty language in the subscription agreement, Walker testified that he wanted to make sure that the people who were going to make an investment had all of the information about the partnership available to them, in the written documentation provided, and that they all had been provided it, and he assumed that they had read it in view of their signing the subscription agreement to that effect. In dialogue with the court during the trial, Walker's counsel stated, "There's no dispute at all except for Mr. Donnie McFadden [that] [a]ll the other individuals were brought into the investment by Mr. Walker, who approached them about the investment. There's no dispute about that." [11]

Based upon this evidence the trial court concluded that Walker, the general part-

9. One of the individuals to whom Walker sent the "private placement memorandum" was Babcock, the manager of the Idaho First National Bank in Twin Falls, who had expressed an interest in investing in the limited partnership. However, Babcock ultimately concluded that he could not invest because of his position at the bank. Babcock spoke glowingly of the project and delivered his documents to his friend, bank customer, and sometime investment partner, Donnie McFadden, who ultimately became the twenty-third limited partner in the venture, along with the other eleven clients of Walker and their wives. Much of McFadden's contact and information about the project initially came from Babcock. However, McFadden did, prior to signing a subscription agreement for one of the limited partnership interests, travel to the White Arrow Ranch with Walker where they personally viewed the physical site and discussed the project and its potential for development. McFadden also submitted the private placement memorandum to his accountant for his review prior to making the decision to invest.

10. Walker in his testimony described the business plan as being more optimistic concerning the potential for the project, and the private placement memorandum as a more conservative evaluation of the project.

11. Donnie McFadden was not solicited by Walker to enter the partnership. McFadden was an

experienced businessman who had been engaged in a variety of business ventures in California and Idaho and who was in the horse breeding business near Hagerman, Idaho, at the time he became a limited partner. He had been a friend of Babcock's since the late 1970's and had banked at Babcock's branch of the Idaho First National Bank since the early 1980's. McFadden and Babcock had themselves been involved in two or three business ventures, and Babcock first advised McFadden of the mushroom venture and its profit potential. Babcock advised McFadden, according to McFadden's testimony, that if there was another "slot" available in the limited partnership he ought to consider investing. Later, the two considered splitting Babcock's opportunity to invest. When Babcock concluded that he would not be able to participate because of his position with the bank, he gave some of the financial data and documents which he had to McFadden for his consideration. McFadden testified that, while he had received the three-ring binder (the private placement memorandum), he did not read it personally but delivered it to his accountant for his review. McFadden and his family members were personally accompanied to the mushroom-growing site by Walker who answered all their questions with regard to the investment. Thereafter, on August 7, 1984, McFadden purchased his interest in the limited partnership.

ner, had the superior knowledge regarding the loan transaction and the mushroom venture, not the bank's representatives, and denied Walker's claim that the bank owed Walker a fiduciary duty. We agree.

Both the bank and the borrowers hoped to monetarily benefit by the loan transaction. They were bargaining at arm's length, according to Walker, and each was looking out after its own interest. Each was competently represented by a qualified representative who was fully capable of protecting the interests of their parties.[12]

To hold the bank to the standard of a fiduciary in this financing transaction, thus requiring it to act primarily for the benefit of the borrower rather than itself, "would put an intolerable obligation upon banking institutions and convert ordinary day-to-day business transactions into fiduciary relationships where none were intended or anticipated." *Denison State Bank v. Madeira*, 640 P.2d at 1243. Accordingly, we reaffirm our recent decision in *Black Canyon Racquetball Club, Inc.*, and conclude that on this record the trial court erred in submitting the borrowers' claim of breach of fiduciary duty to the jury.

JOHNSON and BOYLE, JJ., and SCHROEDER and McKEE, JJ. Pro Tem., concur.

## V

### DEFAMATION

In his amended counterclaim, Robert Erkins raised a claim for defamation. The jury found in favor of him on his defamation claim. Idaho First challenges the award claiming, among other things, that the claim was barred by the statute of limitations.

The defamation claim was based upon several statements made by Babcock, the Idaho First officer in charge of this loan, about Robert Erkins. The record indicates

that these statements were made during the months of April, May and June of 1985, nine months after the loan agreement was consummated. Erkins first asserted the claim of defamation in his amended counterclaim filed March 24, 1988, well beyond the two-year statute of limitations proscribed by I.C. § 5–219(5).[13] However, Erkins asserts that under I.R.C.P. 15(c) his defamation claim relates back to the initial counterclaim filed May 12, 1987, which was less than two years after at least some of the statements were made. In the alternative, Erkins claims that Idaho First waived its statute of limitations defense.

■ Regarding Erkins' contention that the defamation claim raised in the amended counterclaim relates back to the initial counterclaim, I.R.C.P. 15(c) provides that "[w]henever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." If, however, the amended pleading sets forth a new cause of action unrelated to the original transaction or occurrence pled, the amendment does not relate back to the date of the original pleading. *Black Canyon, supra; Wing v. Martin*, 107 Idaho 267, 688 P.2d 1172 (1984).

■ The Erkins' initial counterclaim did not allege any defamation cause of action, nor did it allege any conduct on the part of the bank which would give rise to a defamation action by Robert Erkins. In the claim of breach of the duty of good faith and fair dealing contained in the original counterclaim, Erkins alleged that "Mr. Babcock provided inaccurate and misleading information to investors ... the effect of which was to have adverse impact on the Facility's operations. In particular, Mr. Babcock provided inaccurate and misleading information concerning the activities of Randy Erkins ...," the son of counter-

---

12. Walker testified that he was experienced in these types of financing negotiations and that he was diligent in representing the interests of the partnership.

13. **5–219. Actions ... for personal injuries.—** Within two (2) years:

\* \* \* \* \* \*

5. An action for libel, slander, assault, battery, false imprisonment or seduction.

claimant Robert Erkins. However, these allegations only concern Robert Erkins' son, Randy, and then only in relation to a claim of breach of the implied covenant of good faith and fair dealing. There was no notice of a defamation claim against anyone. Therefore, we conclude that the defamation claim alleged in the amended counterclaim did not arise out of any "conduct, transaction or occurrence set forth" in the original counterclaim. I.R.C.P. 15(c). Accordingly, the defamation claim does not relate back to the filing of the initial counterclaim, filed May 12, 1987, and the defamation claim is barred by the applicable two-year statutes of limitations. I.C. § 5–219(5). As this Court stated in *Black Canyon, supra:*

> Given the fact that ... these new tort causes of action were entirely different from the claim ... contained in the original complaint, and because the new claims relied in part upon new facts not alleged in the original complaint, the trial court concluded that the tort claims in the amended complaint did not relate back to the time of filing of the original complaint under I.R.C.P. 15(c), and were barred by the statute of limitations.... We conclude that the trial court did not err or abuse its discretion in so holding.

119 Idaho at 178, 804 P.2d at 907.

■ Erkins contends, nevertheless, that Idaho First waived its statute of limitations defense by failing to request that it be included as an instruction to the jury. The Erkins argue that since the bank neglected to raise the issue before the jury, it cannot now raise it on appeal.

Idaho First raised the statute of limitations defense in its answer to Erkins' amended counterclaim, which first raised the defamation claim. Idaho First's answer stated that "[c]ounterclaimants' claims are barred in whole or in part by the applicable statute of limitations, including, but not limited to, Idaho Code §§ 5–217, 5–

218, *5–219,* 5–224 and 12 U.S.C. § 1977." (Emphasis added.) I.R.C.P. 9(h) states: "In pleading the statute of limitations it is sufficient to state generally that the action is barred, and allege with particularity the Session Law or the section of the Idaho Code upon which the pleader relies." Thus, the bank's assertion of the statute of limitations in I.C. § 5–219 in its answer was sufficient to raise the statute of limitations as a defense to the Erkins defamation action. *Resource Engineering, Inc. v. Siler,* 94 Idaho 935, 500 P.2d 836 (1972); *Joseph v. Darrar,* 93 Idaho 762, 472 P.2d 328 (1970).

In its memorandum decision denying the bank's post-trial motions, the trial court held that the bank had not requested an instruction on the statute of limitations defense prior to the case being submitted to the jury and, therefore, the defense was waived pursuant to I.R.C.P. 49(a).[14] The trial court's determination that the statute of limitations defense was waived pursuant to I.R.C.P. 49(a) because the bank failed to request a jury instruction assumes that this defense presented a question of fact. However, as this Court noted in *Reis v. Cox,* 104 Idaho 434, 660 P.2d 46 (1982):

> The time when a cause of action accrues may be a question of law or a question of fact, depending upon whether any disputed issues of material fact exist. Where there is no dispute over any issue of material fact regarding when the cause of action accrues, the question is one of law for determination by the court.

104 Idaho at 438, 660 P.2d at 50 (citations omitted).

The testimony at trial was undisputed that the defamatory statements allegedly made by Babcock occurred during April, May and June of 1985. There was no question of fact to resolve concerning the date of those statements or the date when

---

14. I.R.C.P. 49(a) provides in part that if "the court omits [in a special verdict form] *any issue of fact* raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict." (Emphasis added.)

the defamation claim was filed, which was more than two years after the statements were made. Thus, the statute of limitations defense was a question of law. Not only did the bank raise the statute of limitations in its answer, but the bank moved for a judgment notwithstanding the verdict based upon the statute of limitations defense as set out in its answer to the amended counterclaim. I.R.C.P. 50(b) provides that, "Any party aggrieved by a verdict, whether or not he has previously moved for a directed verdict, may move within fourteen days after the entry of judgment to have the verdict and any judgment entered thereon set aside...." Since the statute of limitations defense was raised in the answer to the amended counterclaim as provided in I.R.C.P. 9(h), and in the motion for j.n.o.v., and since there was no factual issue over whether or not more than two years had elapsed between the making of the statements and the filing of the amended counterclaim, the issue of the statute of limitations was one of law, and the trial court erred in failing to grant the bank's motion for judgment notwithstanding the verdict on the basis that the defamation claim asserted by Erkins was barred by the two-year statute of limitations proscribed in I.C. § 5–219(5).

JOHNSON and BOYLE, JJ., and SCHROEDER and McKEE, JJ. Pro Tem., concur.

## VI

### TORTIOUS INTERFERENCE WITH CONTRACT

Erkins' amended counterclaim included a claim for tortious interference with contractual relationships. Erkins alleged that the bank (1) interfered with his arrangement with Bliss Valley to provide consulting services and also (2) interfered with the receipt of lease payments from the real property which he had leased to Bliss Valley. The jury awarded $250,250 to Erkins on this claim.

The bank appeals, claiming, among other things, that (1) there was no evidence to support the claim of tortious interference with contractual relations; (2) the bank's actions were privileged because of its financial interest and investment in the enterprise; (3) there was no evidence to support the amount of damages awarded by the jury; (4) the jury was improperly instructed on the law relating to tortious interference with contracts, and (5) Idaho has not adopted the tort of interference with prospective economic advantage which was included in Instruction No. 48, the instruction on "tortious interference with contractual relationships." For several reasons, we conclude that the instructions were erroneous and that the judgment and award for tortious inference with contractual relations must be reversed for a new trial.

### A.

First, the jury was improperly instructed on the law relating to tortious interference with contractual relations. In Instruction No. 48, the jury was instructed that the elements which Erkins must prove are:

1. The existence of a contract or prospective economic advantage;

2. Knowledge by the interfering party;

3. Intentional interference with the contract or prospective economic advantage without justification; and

4. Damage proximately caused by the interference.

This instruction misstates the prima facie elements of the tort of interference with contract by a third party as set forth by this Court in *Barlow v. International Harvester Co.*, 95 Idaho 881, 522 P.2d 1102 (1974). Furthermore, it merges the claims of tortious interference with contract and the tortious interference with a prospective economic advantage, which has different elements, as set out in Part B, *infra.*

In *Barlow*, the Court held that a prima facie case of the tort of interference with contract requires the plaintiff to prove:

(a) the existence of a contract;

(b) knowledge of the contract on the part of the defendant;

(c) intentional interference *causing a breach of the contract;*

(d) injury to the plaintiff *resulting from the breach.*

*Id.* at 893, 522 P.2d at 1114 (emphasis added). The *Barlow* case then provides that after the plaintiff has established a *prima facie* case, "the burden is on the defendant to prove justification." [15]

Instruction No. 48 given by the court was erroneous. The *Barlow* case clearly requires the claimant to prove, and the jury to find, an "intentional interference *causing a breach* of the contract...." The given instruction did not require Erkins to prove that the intentional interference *caused the breach of the contract.* It only required that the intentional interference resulted in damage proximately caused by the interference.

Erkins was asserting essentially two claims of interference. First, he was claiming that the bank interfered with his arrangement with Bliss Valley to provide consulting services, and, second, that the bank interfered with the receipt of lease payments from the real property which he had leased to Bliss Valley.

Whether or not the bank's conduct was an "intentional interference causing a breach of the contract" was a disputed issue of fact in the case. There was substantial, though conflicting, evidence introduced to the effect that the limited partners were dissatisfied with Erkins' management activities as a general partner of the Bliss Valley operation, and that dissatisfaction was the cause of Erkins being

removed from management. Also, regarding the lease payments, the loan agreement with the bank, signed by Erkins, provided that if the loan was in default no payments would be made to any of the partners.

Under the *Barlow* case, Erkins had the burden of proving that it was the intentional interference by the bank which caused the breach of the contract between Bliss Valley and Erkins, and not dissatisfaction by the limited partners which caused Bliss Valley to terminate any contract it had with Erkins. Instruction No. 48 did not follow the *Barlow* requirement and instruct the jury that the intentional interference must have caused the breach of the contract before any liability would accrue.

A party is entitled to have a jury properly instructed on the issue of causation. Failure to give a proper instruction on causation is reversible error. *Robertson v. Richards,* 115 Idaho 628, 769 P.2d 505 (1989); *Corey v. Wilson,* 93 Idaho 54, 454 P.2d 951 (1969). The given instruction erroneously set forth the law of causation for tortious interference with contract, as set out in the *Barlow* case, and requires the granting of a new trial. *Robertson v. Richards, supra; Corey v. Wilson, supra.*

## B.

The bank also claims on appeal that Idaho has never adopted the cause of action of tortious interference with a "prospective economic advantage," and therefore the trial court erred in including that claim within Instruction No. 48. While we

---

15. With regard to justification for an interference, the *Barlow* case noted:

"'Unlike the law of defamation, this branch of the law [interference with contract] has not crystallized a complete set of definite rules as to the existence or non-existence of privilege. * * * The issue in each case is whether the actor's conduct is justifiable under the circumstances; whether, upon a consideration of the relative significance of the factors involved, his conduct should be permitted despite its expected effect of harm to another." Restatement of Torts § 767, comment a at 63 (1939). 'What is "unwarranted" interference depends on the facts of each case.' *Watson v. Settlemeyer,* 150 Colo. 326, 372 P.2d 453, 456 (1962). *See also Freed v. Manchester Service,*

*supra* [165 Cal.App.2d 186], 331 P.2d [689] at 691–692 [1958]. When an action involving interference with contract is tried to a jury, it is ordinarily for the jury to determine whether the interference of the defendant was justified. *Mitchell v. Aldrich, supra,* [122 Vt. 19], 163 A.2d [833] at 837 [1960]; *Jackson v. O'Neill,* 181 Kan. 930, 317 P.2d 440, 443 (1957).

"Otherwise justifiable conduct is rendered unjustified where improper means, such as defamation, are employed by the defendant. W.L. Prosser, Handbook of the Law of Torts § 129, pp. 936–37 (4th ed. 1971). *See Calbom v. Knudtzon, supra* [65 Wash.2d 157], 396 P.2d [148] at 151 [1964]."

95 Idaho at 893, 522 P.2d at 1114.

have not directly ruled on the question, we have alluded to the tort in two prior cases, *Barlow v. International Harvester*, 95 Idaho 881, 522 P.2d 1102 (1974), and *Twin Falls Farm & City Distributing, Inc. v. D & B Supply Co., Inc.*, 96 Idaho 351, 528 P.2d 1286 (1974). In *Twin Falls Farm & City Distributing*, this Court noted that the tearing down of a sign in an adjoining building by a competitor "was both a trespass to appellant's ownership and possessory rights in the sign and the window space, as well as a common law tort of 'interference with prospective advantage.'" 96 Idaho at 359, 528 P.2d at 1294, *citing* both *Barlow, supra*, and the Tentative Draft No. 14, Restatement of the Law of Torts (2d), § 766A at pp. 50 *et seq.* (1969), and Prosser, Law of Torts, § 130 at pp. 949 *et seq.* (4th ed. 1971).

Since the *Twin Falls Farm & City* case, this Court has not had occasion to address the issue again. However, several of our neighboring states have in recent years. *See Pleas v. City of Seattle*, 112 Wash.2d 794, 774 P.2d 1158 (1989); *Top Service Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 582 P.2d 1365 (1978); *Dolton v. Capital Federal Savings & Loan Ass'n*, 642 P.2d 21 (Colo.App.1981). These cases, as well as numerous other recent cases, have approved some variation of the claim of tortious interference with a prospective business relationship, or prospective economic advantage. However, all of the cases require as an element of proof of the plaintiff's claim that the defendant's intentional conduct not only caused the interference with the prospective economic advantage, but also that the defendant's conduct must have been wrongful before the tort arises.

When the Washington Supreme Court, in *Pleas v. City of Seattle*, adopted the tort of "wrongful interference with the economic relationship," as established by the Oregon Supreme Court, it stated:

> We believe that the right balance has been struck by our colleagues on the Oregon Supreme Court. Rejecting the prima facie tort approach of the first Restatement and declining to adopt in toto the implication of the second Re-

statement that a plaintiff prove that the interference was "improper" under the factors listed in § 767, that court, in an opinion by Justice Linde, redefined the tort as "wrongful interference with the economic relationships". *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 582 P.2d 1365, 1368 (1978). Thus, a cause of action for tortious interference arises from either the defendant's pursuit of an improper objective of harming the plaintiff or the use of wrongful means that in fact cause injury to plaintiff's contractual or business relationships. *Top Serv.*, 582 P.2d at 1368. A claim for tortious interference is established

> when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means.... No question of privilege arises unless the interference would be wrongful but for the privilege ... Even a recognized privilege [however] may be overcome when the means used by defendant are not justified by the reason for recognizing the privilege....

*Top Serv.*, 582 P.2d at 1371. Interference can be "wrongful" by reason of a statute or other regulation, or a recognized rule of common law, or an established standard of trade or profession. Therefore, plaintiff must show not only that the defendant intentionally interfered with his business relationship, but also that the defendant had a "duty of non-interference; *i.e.*, that he interfered for an improper purpose ... or ... used improper means ..." *Straube v. Larson*, 287 Or. 357, 361, 600 P.2d 371 (1979).

We adopt the Oregon formulation of this tort and follow other courts in doing so.

774 P.2d at 1163.

We agree with the Washington court in *Pleas v. City of Seattle*, and the Oregon court in *Top Service Body Shop, Inc. v. Allstate Ins. Co., supra*, and adopt the tort of wrongful interference with economic re-

lationships as outlined in those cases. A plaintiff, in order to establish a *prima facie* case, must show that any claimed intentional interference with a prospective economic advantage resulting in injury to the plaintiff "is wrongful by some measure beyond the fact of the interference itself." *Pleas*, 774 P.2d at 1163. The plaintiff must establish that the intentional interference resulting in injury was wrongful, which may be shown by proof that either: (1) the defendant had an improper objective or purpose to harm the plaintiff; or (2) the defendant used a wrongful means to cause injury to the prospective business relationship.[16]

■ After the plaintiff has established a *prima facie* claim, the burden then shifts to the defendant to establish privilege. "No question of privilege arises unless the interference would be wrongful but for the privilege; it becomes an issue only if the facts charged would be tortious on the part of an unprivileged defendant." *Top Service Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 582 P.2d 1365, 1371 (1978).

■ With regard to Erkins' arrangement with Bliss Valley to provide consulting services, if that arrangement was merely an employment-at-will, terminable by either party without the other having a claim against it for breach of contract, then Erkins' claim based on the loss of those consulting services would not be the tort of interference with contract as set out in *Barlow*, but would have constituted a claim for tortious interference with prospective economic advantage in which Erkins would have to prove that the intentional interference was "wrongful" as defined above. Only if Erkins had a contract with Bliss Valley which would subject Bliss Valley to damages for breach of contract if it terminated the consulting contract with Erkins would Erkins have a claim for tortious interference with a contract under *Barlow*, as outlined in Part A above.

■ With regard to Erkins' claim that the bank intentionally interfered with the receipt of lease payments from the real property which he had leased to Bliss Valley, that claim facially asserts a true *Barlow*-type tortious interference with a contract, *i.e.*, Erkins' lease of real property to Bliss Valley, which, unless there was a clause permitting either party to terminate at will, would appear to be a contract which, if breached by Bliss Valley, would subject it to a damage claim by Erkins. However, paragraph 3.12 of the loan agreement specifically provided that, in the event that Bliss Valley was in default of the terms of the agreement, no payments were to be made to or on behalf of the general partners or the limited partners on any of the contracts which the borrower Bliss Valley had with the general or limited partners. Erkins acknowledged in his testimony that he was aware that, under that provision of the loan agreement he was not entitled to receive any payments from Bliss Valley if Bliss Valley was in default of the loan agreement. Because the trial court made no findings of fact or conclusions of law regarding whether Bliss Valley was in default of the loan agreement, an essential element for determining whether there was breach of the lease or any damages suffered by Erkins as a result of the alleged tortious interference with the lease contract was missing.

Instruction No. 48 improperly merged the separate claims of tortious interference with contract and wrongful interference with economic relationships. It omitted the requirement from *Barlow*, in the tortious interference with the contract claims, that the bank's conduct was an "intentional interference *causing a breach of the contract.*" Furthermore, it did not properly define the claim of tortious interference with prospective economic advantage, particularly the requirement that the interference must be "wrongful" before it is actionable. Accordingly, Instruction No. 48

---

**16.** As the *Top Service* Court indicated, wrongful means would include conduct in violation of "a statute or other regulation, or a recognized rule of common law," such as "violence, threats of other intimidation, deceit or misrepresentation, bribery, ... or disparaging falsehood." *Top Service*, 582 P.2d at 1371.

was erroneous, and that claim must be reversed for a new trial.

BOYLE, J., and SCHROEDER and McKEE, JJ. Pro Tem., concur.

JOHNSON, J., concurs in Part VI(A).

## VII

## PUNITIVE DAMAGES

▮▮▮ The trial court submitted the issue of punitive damages to the jury, which found no punitive damages in favor of Bliss Valley, the Erkins, and the Walkers, but assessed punitive damages in various amounts, ranging from $4,000 to $34,000, in favor of the limited partners-guarantors, for a total punitive damage award of $288,000. Because we have reversed the award of compensatory damages for the bad faith tort and breach of fiduciary duty causes of action, the award of punitive damages must likewise be reversed. *Yacht Club Sales & Service, Inc. v. First National Bank of North Idaho,* 101 Idaho 852, 864, 623 P.2d 464, 476 (1980) ("The judgment in this action awarding compensatory damages must be reversed, and thus the judgment awarding punitive damages must likewise be reversed for further proceedings."). As we have noted in Parts III and IV above, a major portion of the evidence at this trial related to the bad faith tort and breach of fiduciary obligation claims, both of which were erroneously submitted to the jury. On retrial, the evidence may well be different, and the trial court will need to independently evaluate the evidence submitted at retrial to determine whether or not the evidence is sufficient to meet the standard required in *Cheney v. Palos Verdes,* 104 Idaho 897, 665 P.2d 661 (1983). *See also Garnett v. Transamerica Ins. Services,* 118 Idaho 769, 800 P.2d 656 (1990).

JOHNSON and BOYLE, JJ., and SCHROEDER and McKEE, JJ. Pro Tem., concur.

## VIII

## COVENANT OF GOOD FAITH AND FAIR DEALING

The trial court instructed the jury in Instruction No. 39 that:

Every contract imposes on all parties to the contract an obligation of good faith and fair dealing in its performance or enforcement. "Good faith" means honesty in fact in the conduct or the transaction concerned.

Each party owes a duty to exercise good faith in its dealings and transactions with the other party. If a party fails to deal honestly with the other party, it is liable for a breach of the duty of good faith.

Additionally, Instruction No. 40 read:

In all guaranty relationships, Idaho First owes to a guarantor a duty of continuous good faith and fair dealing.

Based upon those instructions, the jury returned a verdict against Idaho First and in favor of Erkins for $250,250, in favor of the Walkers in the amount of $46,000, and in favor of the limited partners in the sum of $2,000 each.

▮▮▮ Idaho First appeals, raising several errors regarding the submission of this issue to the jury. Initially, for the same reason which we reversed the award of punitive damages, *i.e.,* the erroneous admission of evidence in support of the bad faith and breach of fiduciary duty claims which should not have been issues in this case, the verdict and judgment on the covenant of good faith and fair dealing must be set aside. *Yacht Club Sales & Service v. First National Bank of North Idaho, supra.* Additionally, we conclude that Instruction No. 39 is contrary to the law established by our prior cases.

▮▮▮ In *Luzar v. Western Surety,* 107 Idaho 693, 692 P.2d 337 (1984), this Court, without defining the nature of the covenant involved, stated that, "Good faith and fair dealing are implied obligations of every contract." 107 Idaho at 696, 692 P.2d at 340. In *Metcalf v. Intermountain Gas Co.,* 116 Idaho 622, 778 P.2d 744 (1989), we first defined what constitutes a breach of the covenant of good faith and fair dealing

by stating, "Any action by either party which violates, nullifies or significantly impairs any benefit of the employment contract is a violation of the implied-in-law covenant." 116 Idaho at 627, 778 P.2d at 749. Further, we stated in *Metcalf* that "the covenant is implied in contracts," and that the breach "results in contract damages, not tort damages." 116 Idaho at 626, 778 P.2d at 748. We reaffirmed that definition of the covenant in *Sorensen v. Comm Tek, Inc.*, 118 Idaho 664, 799 P.2d 70 (1990). Most recently, in *Burton v. Atomic Workers' Federal Credit Union*, 119 Idaho 17, 803 P.2d 518 (1990), this Court described the implied covenant "as a covenant in contract, not in tort, the breach of which is a 'breach of the employment contract, and is not a tort.'" 119 Idaho at 23, 803 P.2d at 524. In *First Security Bank of Idaho v. Gaige*, 115 Idaho 172, 765 P.2d 683 (1988), we pointed out that the implied covenant of good faith and fair dealing cannot be inconsistent with the agreement executed by the parties:

> Gaige claims First Security breached a duty of good faith and fair dealing implied in the guaranties. However, we agree with the trial court's ruling that *First Security did not breach any duty to Gaige by merely exercising its express rights under the guaranty agreement. There is no basis for claiming implied terms contrary to express rights contained in the parties' agreement.*

115 Idaho at 176, 765 P.2d at 687 (emphasis supplied).

Our analysis and definition of the implied covenant of good faith and fair dealing is consistent with surrounding states. In *Badgett v. Security State Bank*, 116 Wash.2d 563, 807 P.2d 356 (1991), the Washington Supreme Court just this year described the implied covenant of good faith and fair dealing as follows:

> There is in every contract an implied duty of good faith and fair dealing. This duty obligates the parties to cooperate with each other so that each may obtain the full benefit of performance. ... *However, the duty of good faith does not extend to obligate a party to accept*

*a material change in the terms of its contract.* ... Nor does it "inject substantive terms into the parties' contract." Rather, it requires only that the parties perform in good faith the obligations imposed by their agreement. ... *Thus, the duty arises only in connection with terms agreed to by the parties* ....

807 P.2d at 360 (emphasis supplied).

As the foregoing cases demonstrate, the implied covenant of good faith and fair dealing is a covenant implied by law in the parties' contract. No covenant will be implied which is contrary to the terms of the contract negotiated and executed by the parties. *First Security Bank of Idaho v. Gaige*, 115 Idaho 172, 765 P.2d 683 (1988); *Clement v. Farmers Ins. Exchange*, 115 Idaho 298, 766 P.2d 768 (1988) (an implied covenant of good faith and fair dealing cannot override an express provision in a contract). The covenant requires "that the parties perform in good faith the obligations imposed by their agreement," *Badgett v. Security State Bank*, 116 Wash.2d 563, 807 P.2d 356, 356 (1991), and a violation of the covenant occurs only when "either party ... violates, nullifies or significantly impairs any benefit of the ... contract...." *Sorensen v. Comm Tek, Inc.*, 118 Idaho 664, 669, 799 P.2d 70, 75 (1990); *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 778 P.2d 744 (1989).

In this case the trial court, which did not have the benefit of our *Metcalf, Sorensen* and *Burton* decisions at the time it prepared the instructions for the jury, instructed the jury in Instruction No. 39 that the covenant of good faith and fair dealing "means honesty in fact in the conduct or the transaction concerned. ... If a party fails to deal honestly with the other party, it is liable for breach of the duty of good faith." Instruction No. 39 does not explain what "dealing honestly with the other party" means, nor does the instruction advise the jury that, by merely standing upon the terms of a contract, a party does not fail to deal honestly with another party regardless of how onerous the terms of that contract may be. In addition to

being an inadequate statement of the requirements of the good faith implied covenant, the jury may well have confused the "dealing honestly" requirement in Instruction No. 39 with the "intentionally unreasonable" requirement of the bad faith tort in Instruction No. 53. The jury may well have concluded that under Instruction No. 53, if a party intentionally acted unreasonably, he might also have "failed to deal honestly with the other party" under Instruction No. 39, even though in both cases he was merely enforcing his rights under the contract.

Instruction No. 39 did not adequately inform the jury of the law relating to the implied covenant of good faith as outlined in *Metcalf* and *Sorensen*. The covenant of good faith and fair dealing is only violated when "action by either party ... violates, nullifies or significantly impairs any benefit of the ... contract." *Metcalf, supra.* The covenant requires "that the parties perform in good faith the obligations imposed by their agreement." *Badgett v. Security State Bank*, 116 Wash.2d 563, 807 P.2d 356 (1991). "There is no basis for claiming implied terms contrary to the express rights contained in the parties' agreement." *First Security Bank of Idaho v. Gaige*, 115 Idaho 172, 176, 765 P.2d 683, 687 (1988); *Clement v. Farmers Ins. Exchange*, 115 Idaho 298, 766 P.2d 768 (1988).

Since the covenant of good faith is a "covenant ... implied in the contract" under our *Metcalf, Sorensen* and *Burton* cases and only requires the parties to perform in good faith the obligations contained in their agreement, the covenant is only violated when "action by either party ... violates, nullifies or significantly impairs any benefit of the ... contract." *Metcalf v. Intermountain Gas Co., supra; Sorensen v. Comm Tek, supra.* A violation of the implied covenant is a breach of the contract. It does not result in a cause of action separate from the breach of contract claims, nor does it result in separate contract damages unless such damages specifically relate to the breach of the good faith covenant. To hold otherwise would result in a duplication of damages awarded for breach of the same contract. As in other contract cases, a claimant may be entitled to consequential damages for breach of the implied covenant of good faith if "there is something in that contract that suggests that they were within the contemplation of the parties and are proved with reasonable certainty." *Brown's Tie & Lumber Co. v. Chicago Title Co.*, 115 Idaho 56, 61, 764 P.2d 423, 428 (1988).

Because Instruction No. 39 did not sufficiently define the implied covenant of good faith and fair dealing and the circumstances in which the covenant is not applicable, the judgment and award of damages for breach of the implied covenant are reversed.

BOYLE, J., and SCHROEDER and McKEE, JJ. Pro Tem., concur.

JOHNSON, J., concurs in result.

## IX

## REALIGNMENT OF THE PARTIES

On retrial the trial court must reevaluate the realignment in light of the fact that three of the borrowers' tort claims, bad faith tort, breach of fiduciary duty, and defamation, which resulted in the bulk of the evidence being admitted at trial, have now been eliminated. The only tort claims remaining are (1) Robert Erkins' claim of tortious interference with contract or tortious interference with prospective economic advantage, and (2) possibly the limited partners' claim of negligent misrepresentation. (*See* Part X, *infra.*)

This action began as a mortgage foreclosure action. Regardless of whether a case is tried to the court or to the jury, the interpretation of a contract or other written document is a question of law for the court, not the finder of fact, unless there is an ambiguity, and then only the ambiguous portion is a factual issue. *DeLancey v. DeLancey*, 110 Idaho 63, 714 P.2d 32 (1986); *Bergkamp v. Carrico*, 101 Idaho 365, 613 P.2d 376 (1980).

The rights, duties and responsibilities of the parties in this equitable fore-

closure proceeding are to be determined by the court based upon the comprehensive group of documents negotiated and executed by the parties.[17] *Carpenter v. Double R Cattle Co.*, 108 Idaho 602, 701 P.2d 222 (1985). The borrowers' counterclaims depend, to a greater or lesser degree, upon the determination of the rights and duties created by the original loan transaction and the trial court's findings of fact and conclusions of law on the equitable issues. In making these findings of fact, the judge may defer to, but is not bound by, findings made on similar factual issues by the jury on any legal counterclaim. *State ex rel. McAdams v. District Court*, 105 N.M. 95, 728 P.2d 1364, 1366 (1986) ("[W]hen legal and equitable issues are joined in a lawsuit the trial court should first decide the equitable issues, and then if any independent issues remain, those issues may be tried to a jury upon appropriate request."); *Penmont Enterprises, Inc. v. Dysart*, 340 So.2d 1285 (Fla.App.1977); *Jaffe v. Albertson Co.*, 243 Cal.App.2d 592, 53 Cal.Rptr. 25, 36 (1966) ("[W]hen a case involves both legal and equitable issues the court may in its discretion decide the equitable issues first. If the decision as to the equitable issues is such as is determinative of the legal issues a jury trial as to the latter is obviated. If not, the jury trial as to the remaining issues will follow."). However, "the trial court should defer entry of judgment in the foreclosure proceedings until after determination of the counterclaim[s]." *David Steed and Associates v. Young*, 115 Idaho 247, 252, 766 P.2d 717, 722 (1988) (Johnson, J. concurring specially); *Folkner v. Collins*, 249 Iowa 1141, 91 N.W.2d 545 (1958).

BOYLE, J., and SCHROEDER and McKEE, JJ. Pro Tem., concur.

---

17. The equitable claim against the limited partners, in their capacity as limited partners, is limited to their investment interest in the limited partnership's assets. The bank's additional claims against the limited partners on their assumption of liability agreements and guaranties are legal claims, not equitable claims.

## X

### CROSS APPEAL

The Walkers have filed a cross appeal for failure of the trial court to submit their claim of breach of fiduciary duty by the bank. However, we have concluded that the trial court erred in submitting any of the borrowers' claims of breach of fiduciary duty to the jury. (See Part IV.) Accordingly, the Walkers' claim on their cross appeal has no merit.

The limited partners raise two issues on cross appeal.[18] First, they claim that the trial court erred by refusing to submit their claim of the bank's negligent misrepresentation to the jury. We recognized a cause of action for negligent misrepresentation in *Idaho Bank & Trust v. First Bancorp*, 115 Idaho 1082, 772 P.2d 720 (1989). *Idaho Bank & Trust* was decided on April 26, 1989, and this case went to trial in April, 1989. The legal issues in this case had been solidified and the discovery completed long prior to that time, and thus the decision in the *Idaho Bank & Trust* case was essentially not available to the parties or the district court for this trial. Since the quantity and type of evidence which will be allowed at retrial will be different, given our decision today which limits substantially the issues to be tried upon remand, we need not resolve whether the trial court erred in failing to submit the limited partners' claim of negligent misrepresentation to the jury. On retrial the trial court should evaluate the limited partners' negligent misrepresentation claims under our decisions in *Idaho Bank & Trust v. First Bancorp, supra,* and *Hudson v. Cobbs*, 118 Idaho 474, 797 P.2d 1322 (1990), based upon the evidence at retrial.

◼ The limited partners also raise on cross-appeal the trial court's denial of their defense of a good faith duty on the part of

---

18. The limited partners do not argue that the alleged errors they raise in their cross-appeal require reversal and a new trial. They simply argue that, in the event this case is reversed and remanded for a new trial based on the other issues raised by the bank, these two issues should be submitted to the jury.

the bank to provide information. We agree with the trial court's decision to deny this defense. As we discussed extensively above in Part III regarding the bad faith tort, in a contractual setting, the duties and obligations of the partners are created by the terms of the contract. "Courts [cannot] interpret an agreement to mean something that it does not say, nor interpolate into a contract something the contract does not itself contain." *Nuquist v. Bauscher*, 71 Idaho 89, 95, 227 P.2d 83, 87 (1951). *See also, Ohms v. Church of the Nazarene*, 64 Idaho 262, 130 P.2d 679 (1942); *J.R. Simplot Company v. Chambers*, 82 Idaho 104, 350 P.2d 211 (1960). To impose a duty on the bank to provide information regarding "material changes in the nature of the risk" would be to impose a "free floating duty" not found in the express or implied terms of the loan agreement. *Badgett v. Security State Bank*, 116 Wash.2d 563, 807 P.2d 356 (1991). Accordingly, we affirm the trial court's decision to reject this defense.

None of the borrowers have raised on cross appeal any issue of law or fact regarding the jury's verdict finding that there was no fraud and no violation of RICO. Because they have not raised any issue claiming error either in the admission of evidence, the instructions to the jury, or that the jury's verdict was against the great weight of evidence on their claims of fraud and RICO violation, the jury's verdict and the court's judgment denying any relief on those issues is *res judicata,* and those issues will not be subject to retrial on remand. *Walker v. Shoshone County*, 112 Idaho 991, 993, 739 P.2d 290, 292 (1987) ("A cross appeal is required only when the respondent seeks to change or add to the relief afforded below...."); *Gonzales v. R.J. Novick Constr. Co., Inc.*, 20 Cal.3d 798, 144 Cal.Rptr. 408, 575 P.2d 1190 (1978):

> "Ordinarily [an appeal from a specific portion of a judgment] would leave the parts not appealed from unaffected, and it would logically follow that such unaffected parts must be deemed final, being a final judgment of the facts and rights which they determine. The decisions are to the effect that upon such an appeal where the parts not appealed from are not so intimately connected with the part appealed from that a reversal of that part would require a reconsideration of the whole case in the court below, the court upon such partial appeal can inquire only with respect to the portion appealed from." [Citation omitted.] ... [I]t is "the general principal that an appeal from a distinct and independent part of a judgment does not bring up the other parts for review in the appellate court, and that a reversal of the part appealed from does not affect the portions not dependent thereon, but that they will stand as final adjudications[.]"

144 Cal.Rptr. at 412, 575 P.2d at 1194, *quoting Whalen v. Smith*, 163 Cal. 360, 125 P. 904 (1912).

In *Tolman v. Tolman*, 93 Idaho 374, 461 P.2d 433 (1969), this Court stated:

> It is a sound rule of practice, and one to which we have long subscribed, that a trial court will restrict its consideration in a remanded action to those questions specified in the mandate and will not reexamine issues already laid to rest by the appellate court affirmance on the preceding appeal. The purpose of this precept is to cause litigation to come to an end within some finite period.... In our opinion on the first appeal we affirmed all questions raised in the first trial excepting the three issues which we remanded to the district court. That court was, therefore, correct in refusing to go beyond those three questions.

93 Idaho at 375, 461 P.2d at 434.

The respondents have had one trial and jury verdict on their fraud and RICO claims, and have not raised any issue concerning any error relating to the trial of those claims, or any legal error in the instructions to the jury. Therefore, those issues are laid to rest. Those issues are not so intertwined, or so interdependent with the respondents' other claims which must be retried, that the trial of respondents' other issues on remand would be prejudiced by not being allowed to have a retrial on what was an otherwise error-free

trial as far as the fraud and RICO issues are concerned. Accordingly, the respondents' fraud and RICO claims will not be issues on retrial.

JOHNSON and BOYLE, JJ., and SCHROEDER and McKEE, JJ. Pro Tem., concur.

The judgment of the district court is reversed, and the cause remanded for a new trial consistent with this opinion.

Costs to appellant. An award of attorney fees to any party is deferred pending the final outcome in the trial court.

## APPENDIX A
### GEO/PLEUROTUS GROWERS LIMITED PARTNERSHIP

### SUBSCRIPTION AGREEMENT

Geo/Pleurotus Growers Limited Partnership
P. O. Box 1892
184 Second Street West
Twin Falls, ID 83303-1892

　　　　1.　Subscription.　The undersigned hereby applies to become a Limited Partner in Geo/Pleurotus Growers Limited Partnership (the "Partnership"), a limited partnership to be formed under the laws of the State of Idaho with Robert A. Erkins and Thomas G. Walker Jr. as the General Partners (the "General Partners"), and to purchase the number of units of limited partnership interest (the "Units") indicated below in accordance with the terms of this agreement and the Certificate and Agreement of Limited Partnership (the "Partnership Agreement") attached to the Confidential Private Placement Memorandum, dated May 20, 1984, relating to the Units (such Confidential Private Placement Memorandum including all financial statements, exhibits and schedules contained therein or attached thereto, and any amendments and supplements thereto, is herein called the "Memorandum"). This subscription may be rejected by the General Partners in their sole discretion.

　　　　2.　Representations and Warranties.　The undersigned acknowledges, represents, warrants and agrees as follows:

　　　　　　　　(a)　The undersigned has received the Memorandum, and has carefully reviewed the Partnership Agreement and the Memorandum, and has relied in making this investment only on the information contained therein, information otherwise provided to him in writing by the General Partners or information from books and records of the General Partners.　The undersigned understands that all documents, records and books pertaining to this investment have been made available for inspection by his attorney and/or his accountant and/or his Purchaser Representative(s), as such term is defined in Regulation D promulgated under the Securities Act of 1933, as amended (the "Act"), and him, and that the books and records of the Partnership will be available upon reasonable notice, for inspection by investors during reasonable business hours at its principal place of business.　The undersigned and/or his advisor(s), if any, have had a reasonable opportunity to ask questions of, and receive answers

ADMITTED

Date 4-18-89

PLAINTIFF'S EXHIBIT 6857

from, the General Partners, or a person or persons acting on their behalf, concerning the offering of the Units, and all such questions have been answered to the full satisfaction of the undersigned. No oral representations have been made or oral information furnished to the undersigned or his advisor(s) in connection with the offering of the Units which were not contained in the Memorandum.

(b) The undersigned (i) has adequate means of providing for his current needs and possible personal contingencies, (ii) has no need for liquidity in this investment, (iii) is able to bear the substantial economic risks of an investment in the Units for an indefinite period, and (iv) at the present time, could afford a complete loss of such investment.

(c) The undersigned's commitment to investments which are not readily marketable is not disproportionate to his net worth and his investment in the Units will not cause his overall commitment to become excessive.

(d) The undersigned recognizes that the Partnership has only recently been organized and has no financial or operating history and that the Units as an investment involve significant risks, including those set forth under the captions "Risk Factors" and "Certain Federal Income Tax Considerations" in the Memorandum.

(e) The undersigned and/or his advisor(s) and/or his Purchaser Representative(s) (if applicable) have such knowledge and experience in financial, tax and business matters to enable him and/or them to utilize the information made available to him and/or them in connection with the offering of the Units, to evaluate the merits and risks of the prospective investment and to make an informed investment decision with respect thereto. Each Purchaser Representative, if any, has confirmed in writing the specific details of any and all past, present or future relationships, actual or comtemplated, between himself or his affiliates and the General Partners or any of their affiliates and any compensation received or to be received as a result of any such relationships.

(f) The undersigned understands that the Memorandum has not been filed with or reviewed by any Federal or state securities administrators because of

-2-

the representation made by the General Partners as to the private or limited nature of the offering.

(g) The undersigned understands that the sale of the Units has not been registered under the Act in reliance upon an exemption therefrom for non-public offerings. The undersigned understands that the Units may have to be held indefinitely unless the sale or other transfer thereof is subsequently registered under the Act, as amended, or an exemption from such registration is available. The undersigned further understands that the Partnership is under no obligation to register the Units on his behalf or to assist him in complying with any exemption from registration.

(h) The undersigned represents that the Units are being purchased soley for his own account for investment purposes only and not for the account of any other person and not for distribution, assignment or resale to others and that no other person has a direct or indirect beneficial interest in such Units.

(i) The undersigned understands that he may not be able to sell or dispose of his Units as there will be no public market for them. In addition, the undersigned understands that his right to transfer the Units will be subject to the conditions set forth in the Partnership Agreement, including consent of the General Partners and restrictions against transfer unless the transfer is not in violation of the Act and applicable state securities laws (including investor suitability standards). The undersigned understands that the General Partners will not consent to a transfer of a Unit unless the transferee represents that he meets the financial suitability standards required of an initial subscriber unless such conditions are waived by the General Partners, and that the General Partners have the right, in absolute discretion, to refuse to consent to the transfer of a Unit.

(j) The undersigned understands that legends will be placed on any certificates or other documents evidencing the Units with respect to the above restrictions on assignment, resale or other disposition of the Units.

(k) The undersigned, if a corporation, partnership, trust or other entity, is authorized and otherwise duly qualified to purchase and hold the Units, such entity (i) has not been formed for the specific

purpose of acquiring Units in the Partnership or (ii) qualifies as an accredited investor under Rule 501(a)(8) promulgated under the Act and each equity owner thereof has executed and delivered simultaneously herewith a Subscription Agreement substantially identical to this Agreement and a Purchase Questionnaire.

(l) The undersigned represents and warrants that all information provided to the General Partners in the Purchaser Questionnaire or otherwise concerning himself, his investor status, financial position and matters, or, in the case of a corporation, partnership, trust or other entity, the knowledge and experience in financial and business matters of the person making the investment decision on behalf of such entity, is correct and complete as of the date set forth at the end hereof and if there should be any adverse change in such information prior to acceptance of his subscription, he will immediately provide the General Partners with such information.

(m) The undersigned, if he is an individual, is at least 21 years of age.

(n) The undersigned understands that if he shall be in default of any payment due to the Partnership pursuant to the Partnership Agreement, his interest in the Partnership may be sold pursuant to the terms of the Partnership Agreement and that he may not be entitled to receive any amount upon such sale, as provided in the Partnership Agreement. Further, the undersigned understands that the Partnership shall have all rights, remedies and privileges against him that are available at law or in equity, and in addition, the Partnership shall have the right to recover any reasonable court costs and legal fees in connection therewith.

(o) The undersigned understands that the discussion of the tax consequences arising from investment in the Partnership as set forth in the memorandum is general in nature and that the actual tax consequences to the undersigned of investment in the Partnership depend on his individual circumstances.

(p) The undersigned understands that there can be no assurance that the Internal Revenue Code or the regulations thereunder will not be amended or applied in such a manner as to deprive the Partnership and its

partners of some or all of the tax benefits they might expect to receive, and that some of the deductions claimed by the Partnership or the allocation of items of income, gain, loss, deduction or credit among the partners may not be challenged by the Internal Revenue Service.

(q) THE UNDERSIGNED UNDERSTANDS THAT THE UNITS HAVE BEEN ISSUED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE FEDERAL SECURITIES ACT OF 1933, AS AMENDED. THE EXEMPTION IS AVAILABLE UNDER §4(2) THEREOF AND RULE 505 OF REGULATION D PROMULGATED THEREUNDER. ACCORDINGLY, THE UNITS MAY NOT BE SOLD OR TRANSFERRED ABSENT REGISTRATION OR AN APPLICABLE EXEMPTION.

3. <u>Adoption of Partnership Agreement.</u> The undersigned hereby adopts, accepts and agrees to be bound by all the terms and provisions of the Partnership Agreement and to perform all obligations therein imposed upon a Limited Partner with respect to the Units purchased. Upon acceptance of this subscription by the General Partners and upon formation of the Partnership, the undersigned shall become a Limited Partner for all purposes.

4. <u>Special Power of Attorney.</u>

(a) The undersigned, by executing this Agreement, irrevocably makes, constitutes and appoints each of the General Partners his true and lawful attorney, for him and in his name, place and stead for his use and benefit, to execute and acknowledge and, to the extent necessary, to file and record:

(i) The Partnership Agreement and all amendments thereto;

(ii) Any other instrument which may be required to be filed by the Partnership, or which the General Partners deem is advisable to file; and

(iii) Any documents which may be required to effect the continuation of the Partnership, the admission or substitution of a Limited Partner, or the dissolution and termination of the Partnership, provided such continuation, admission, substitution or dissolution and termination are in accordance with the terms of the Agreement of Limited Partnership.

(b) Such grant of authority:

(i) Is a Special Power of Attorney coupled with an interest, is irrevocable and shall survive the death or incapacity of the undersigned.

(ii) May be exercised by either of the General Partners either by signing separately as attorney-in-fact for each Limited Partner or, after listing all of the Limited Partners, by executing any instrument with the single signature of a General Partner acting as attorney-in-fact for all of them; and

(iii) Shall survive the assignment by a Limited Partner of the whole or a portion of his interest.

This Special Power of Attorney does not supersede any part of the Partnership Agreement nor is it to be used to deprive the undersigned Limited Partner of any of his rights. It is intended only to provide a simplified system for execution of documents. If required, the undersigned shall execute and deliver to the General Partners within five days after the receipt of a request therefor, such additional designations, powers of attorney or other instruments as the General Partners shall reasonably deem necessary.

5. Indemnification. The undersigned agrees to indemnify and hold harmless the Partnership and the General Partners and the respective agents, employees and affiliates from and against all damages, losses, costs and expenses (including reasonable attorneys' fees) which they may incur by reason of the failure of the undersigned to fulfill any of the terms or conditions of this Agreement, or by reason of any breach of the representations and warranties made by the undersigned herein or in connection with the Partnership Agreement, or in any document provided by the undersigned to the Partnership or the General Partners.

6. Miscellaneous.

(a) The undersigned hereby grants to the Partnership a security interest in Units purchased by the undersigned to secure payment of the Investor's Promissory Note, the form of which is attached as Exhibit "C" to the Memorandum, and performance of the Assumption of Liabilities Agreement in the form attached to the Memorandum as Exhibit "K", being delivered herewith (the "Assumption of Liabilities Agreement").

-6-

(b) In the event the undersigned defaults under either the Investor's Promissory Note or the Assumption of Liabilities Agreement, the Partnership and the lenders shall have all the rights and remedies set forth herein, in the Investor's Promissory Note, and Assumption of Liabilities Agreement, in the Partnership Agreement and as otherwise provided by law.

(c) From the proceeds of any such foreclosure or sale, the Partnership may retain the amount of all costs and expenses incurred by it in connection with such foreclosure or sale, including costs of sale and reasonable attorneys' fees. In the event any surplus remains from the proceeds of such foreclosure or sale, after all authorized deductions and payments to the Partnership, any such remaining surplus shall be paid to the undersigned. The Partnership may become the purchaser at any such sale. The undersigned recognizes that the Partnership may be unable to effect a public sale of all or a part of the Units so purchased because of certain prohibitions contained in the Act and in applicable state securities laws and, therefore, may be compelled to resort to one or more private sales to a restricted group of offerees and purchasers who fulfill certain suitability standards and agree, among other things, to acquire such Units for their own account, for investment purposes only and not with a view to distribution or resale. The undersigned consents to private sales so made even though such sales may be at prices and upon other terms less favorable than if such Units were sold at public sales. The undersigned agrees that private sales made under the foregoing circumstances will be deemed to have been made in a commercially reasonable manner.

(d) The Partnership shall have the right to enforce one or more remedies hereunder, successively or concurrently, and any such action shall not stop or prevent the Partnership from pursuing any further remedy which it may have hereunder, under the Partnership Agreement or by law including, without limitation, the right on the part of the Partnership to waive its rights hereunder and to commence an action on the Investor's Promissory Note and the Assumption of Liabilities Agreement as though the Assumption of Liabilities Agreement was unsecured.

(e) At any time and from time to time, upon request of the Partnership, the undersigned will give, execute, file and/or record any notice, financing

-7-

statement, continuation statement, instrument, document or agreement that the Partnership may consider necessary or desirable to create, perserve, continue, perfect or validate the security interest granted hereunder or which the Partnership may consider necessary or desirable to exercise or enforce its rights hereunder with respect to such security interest.

(f) The undersigned represents and agrees that he will own all of the Units to be purchased free and clear of all liens and encumbrances (other than the security interest granted hereby) and agrees that he will not encumber or grant any security interest in or file a financing statement with respect to such Units, or permit any of the foregoing, without the prior written consent of the Partnership and hereby represents that (except as aforesaid) he has not heretofore done so.

(g) The undersigned agrees not to transfer or assign this Agreement, or any of the undersigned's interest herein, and further agrees that the transfer or assignment of the Units acquired pursuant hereto shall be made only in accordance with the Partnership Agreement and all applicable laws.

(h) The undersigned agrees that the undersigned may not cancel, terminate or revoke this Agreement or any agreement of the undersigned made hereunder and that this Agreement shall survive the death or disability of the undersigned and shall be binding upon the undersigned's heirs, executors, administrators, successors and assigns.

(i) Notwithstanding any of the representations, warranties, acknowledgements or agreements made herein by the undersigned, the undersigned does not hereby or in any other manner waive any rights granted to the undersigned under federal or state securities laws.

(j) This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by all parties.

(k) This Agreement shall be enforced, governed and construed in all respects in accordance with the laws of the State of Idaho. Any action or proceeding commenced by either party to enforce any remedy or right granted or implied by this Agreement shall be

commenced in the Fifth District Court of the State of Idaho in and for the County of Twin Falls and both parties hereby consent to such in personam jurisdiction and venue.

(1) Within five days after receipt of a written request from the Partnership, the undersigned agrees to provide such information and to execute and deliver such documents as reasonably may be necessary to comply with any and all laws and ordinaces to which the Partnership is subject.

7. **Subscription and Method of Payment.** The undersigned, acknowledging that the minimum subscription is thirty thousand (30,000) Units, hereby subscribes for Units and encloses a down payment as follows:

_D-1_ Units at $1.00 per Unit for an aggregate investment of $ _a.a_ payable as follows:

Twenty percent (20%) upon execution and delivery of this Subscription Agreement, and eighty percent (80%) by execution and delivery to the General Partners, or either of them, of an Investor's Promissory Note in the form attached to the Memorandum as Exhibit "C."

8. **Contingency.** This Agreement is contingent upon the commitment for purchase of the minimum number of Units and upon receipt by the Partnership of loan commitments in the aggregate amount of not less than $3,150,000.

[The balance of this page was intentionally left blank.]

302 

## TYPE OF OWNERSHIP

(Check One)

_____ Individual (One signature required)

_____ Joint Tenants with right of survivorship (Both parties must sign)

_____ Tenants in Common (Both parties must sign)

_____ Community Property (Both parties must sign)

_____ Trust (Please include copy of instrument creating Trust)

_____ Corporation (Please include evidence of authorization to purchase in form of resolutions or Articles of Incorporation and By-Laws)

_____ Partnership (Please include copy of Partnership Agreement)

_____
Please print here the exact name (registration) investor desires for Unit(s)

-10-

**SIGNATURE PAGE**

**FOR INDIVIDUAL INVESTORS**

| Husband/Investor | Wife/Investor |
|---|---|

Signature

Social Security Number

Print or Type Name

Residence Address:

_____

Signature

Social Security Number

Print or Type Name

Residence Address:

_____

Executed at:

_____City_____

_____State_____

this_____day of

_____, 19___

Executed at:

_____City_____

_____State_____

this_____day of

_____, 19___

Mailing Address:

_____

-11-

304 
 

STATE OF _____ )
 ) ss.
County of _____ )

 On this ___ day of _____, 1984, before me, the undersigned, a notary public in and for said county and state, personally appeared _____, known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same.

 IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, the same day and year in this certificate first above written.

 Notary Public for_____
 Residing at_____
 Commission expires:_____

STATE OF _____ )
 ) ss.
County of _____ )

 On this ___ day of _____, 1984, before me, the undersigned, a notary public in and for said county and state, personally appeared _____, known to me to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same.

 IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, the same day and year in this certificate first above written.

 Notary Public for_____
 Residing at_____
 Commission expires:_____

SIGNATURE PAGE

FOR CORPORATE INVESTORS

_____
Name of corporation (please print or type)

By: _____
 (Signature of authorized agent)

Title: _____

Taxpayer Identification No.: _____

Address of Principal
 Corporate Offices _____

 _____

 _____

 _____

 Attention: _____

Executed at_____,_____this___day of _____, 19__
 City State

STATE OF _____ )
 ) ss.
County of _____ )

 On this ____ day of _____, 1984, before me,
the undersigned, a notary public in and for said county and
state, personally appeared _____, known to me to be
the President of _____, the corporation whose
name is subscribed to the within instrument or the person who
executed the instrument on behalf of said corporation and
acknowledged to me that such corporation executed the same.

 IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my official seal, the same day and year in this
certificate first above written.

 NOTARY PUBLIC FOR_____
 Residing at_____
 Commission expires:_____

-13-

306 

**SIGNATURE PAGE**

**FOR PARTNERSHIP INVESTORS**

_____
Name of Partnership (please print or type)

By: _____
 Signature of a general partner

By: _____
 Signature of additional general partner (if required by
 Partnership Agreement)

Taxpayer Identification No.: _____

Principal Business
 Address: _____

 _____

 _____

 _____

Mailing Address,
 if different: _____

 _____

 _____

 _____

 _____

 Attention: _____

Executed at_____,_____this___day of _____, 19__
 City State

STATE OF _____ )
 ) ss.
County of _____ )

On this ____ day of _____, 1984, before me, the undersigned, a notary public in and for said county and state, personally appeared _____, known to me to be one of the partners in the partnership of _____, and the partner or one of the partners who subscribed said partnership name to the foregoing instrument, and acknowledged to me that he executed the same in said partnership name.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal, the same day and year in this certificate first above written.

NOTARY PUBLIC FOR _____
Residing at _____
Commission expires: _____

308

SIGNATURE PAGE

FOR TRUST INVESTORS

_____
Name of Trust (please print or type)

_____
Name of Trustee (please print or type)

By: _____
 Trustee's signature

Trustee's Address: _____

 _____

 _____

 _____

 Attention: _____

Executed at_____,_____this___day of _____, 19__
 City State

STATE OF _____ )
 ) ss.
County of _____ )

 On this ____ day of _____, in the year 1984,
before me, the undersigned, a notary public in and for said
county and state, personally appeared _____, known
to me to be the person whose name is subscribed to the within
instrument as trustee and acknowledged to me that she executed
the same as such trustee.

 IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my official seal, the same day and year in this cer-
tificate first above written.

 _____
 Notary Public for_____
 Residing at_____
 Commission expires:_____

-16-

JOHNSON, Justice, concurring, concurring specially, concurring in the result, and dissenting.

I concur in the following parts of the Court's opinion: I (Facts), III (Bad Faith Tort), IV (Fiduciary Duty), V (Defamation), VI(A) (Tortious Interference with Contract), VII (Punitive Damages), and X (Cross Appeal).

I concur specially in part II (Foreclosure Procedure). In my view, footnote 6 should point out the effect of affirmative defenses raised by the borrowers and found by the jury to have been established, but which were not the subject of counterclaims, i.e.: Bliss Valley (excuse), the Erkins (excuse), the Walkers (equitable estoppel and quasi-estoppel), and the limited guarantors (waiver, estoppel, and duress). If Bliss Valley, the Erkins, and the Walkers establish the same affirmative defenses in a new trial, these defenses would defeat Idaho First's recovery.

The claim of Idaho First against the limited guarantors was a legal claim for collection on the guaranties. The limited guarantors demanded and were entitled to a jury trial on this claim and on their affirmative defenses. Because the jury found the limited guarantors had established three affirmative defenses that were not the subject of counterclaims by the limited guarantors, we should affirm the judgment in favor of the limited guarantors against Idaho First on its legal claim to enforce the guaranties.

I dissent from part VI(B) (Interference with Prospective Economic Advantage). In my view, the elements for proving interference with prospective economic advantage should be coordinated with the elements for proving intentional interference with contract formulated in part VI(A). In *Twin Falls Farm & City Distrib., Inc. v. D & B Supply Co.*, 96 Idaho 351, 359, 528 P.2d 1286, 1294 (1974), the Court ruled that one of the respondents had committed the common law tort of interference with prospective advantage. The Court cited *Calbom v. Knudtzon*, 65 Wash.2d 157, 396 P.2d 148 (1964) as authority for this ruling. *Id.* In *Calbom*, the Washington Supreme Court listed the elements of the tort of intentional and unjustified third-party interference with valid contractual relations or business expectancies:

(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. Ill will, spite, defamation, fraud, force, or coercion, on the part of the interferor, are not essential ingredients, although such may be shown for such bearing as they may have upon the defense of privilege.

396 P.2d at 151.

By requiring proof of either (1) an improper objective or purpose to harm the plaintiff, or (2) use of a wrongful means to cause injury to a prospective business relationship, the decision of the Court today implicitly overrules the portion of *Twin Falls Farm* delineating the tort of interference with prospective advantage in Idaho. I would follow the formulation in *Twin Falls Farm*, which coordinates with the elements of interference with contract stated in part VI(A).

I concur in the result of part VIII (Covenant of Good Faith and Fair Dealing). In my view, however, the trial court correctly defined good faith in Instruction No. 39 to mean "honesty in fact in the conduct or the transaction concerned." This is the definition used in I.C. § 28–1–201(19), a portion of the Uniform Commercial Code (UCC) as enacted in Idaho. The loan transaction in this case included a security agreement subject to chapter 9 (Secured Transactions) of the UCC. The first count of Idaho First's complaint was entitled "Foreclosure on Personal Property" and sought foreclosure "pursuant to Section 28–9–504, Idaho Code." The security agreement was an integral part of the loan transaction.

All the parties in this case agree that one of the definitions of good faith in the UCC should be used. Idaho First argues that

the definition of good faith contained in I.C. § 28–1–201(19) applies. The borrowers contend that the definition of good faith contained in I.C. § 28–2–103(1)(b) applies. (" 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.") This definition does not apply here because the security agreement is covered by chapter 9, not chapter 2, of the UCC. By the terms of I.C. § 28–1–201, the definitions stated there apply unless there is an additional definition contained in the applicable chapter of the UCC. There is no definition of good faith in chapter 9.

In my view, the application in this case of principles concerning good faith and fair dealing we have developed in employment cases is not appropriate. The subjective "good faith" required by I.C. § 28–1–201(19) is different from the requirement of good faith we have required in employment cases.

I dissent from part IX (Realignment of the Parties). I disagree with the holding that when legal and equitable issues are joined in a lawsuit, the trial court should first decide the equitable issues and then, if any independent legal issues remain, those issues should be tried to a jury, if one has been requested in a timely fashion. In my view, this impliedly overrules *David Steed and Associates v. Young*, 115 Idaho 247, 766 P.2d 717 (1988) (*Steed I*).

*Steed I* relied on *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959) in holding that in a foreclosure action a defendant is entitled to a jury trial on compulsory legal counterclaims. In *Steed I*, the Court said:

> Thus, it is irrelevant whether the legal issues are "incidental" to the equitable claims, since the right to a jury trial is specifically guaranteed under both Idaho Constitution art. 1 § 7 and I.R.C.P. 38(a). Further, in the instant case, the Bank has only claimed that the case beginning in equity must lie in equity, since the legal issues are "incidental" to the equitable, and both legal and equitable issues are "inextricably intertwined." The Bank has made no showing of "imperative circumstances" in its case which would deprive it of equitable relief if the legal issues were tried to a jury. We can thus find no reason to deny Petitioner Steed his most precious constitutional right to trial by jury.
>
> ... Since the right to a trial by jury is "inviolate" under the Constitution of the State of Idaho, a party to an equity action has a right to a jury trial on the legal causes of action raised pursuant to his compulsory counterclaim, *unless* there is a clear showing of "imperative circumstances" which would cause the equity claimant "irreparable harm while affording a jury trial in the legal cause."
> *Beacon Theatres, Inc.*

115 Idaho at 250–51, 766 P.2d at 720–21 (emphasis in original, footnote omitted).

*State ex rel. McAdams v. District Court*, 105 N.M. 95, 728 P.2d 1364 (1986), cited in the Court's opinion, is contrary to *Steed I* because the New Mexico court employed the principal rejected in *Steed I* that "there is no right to jury trial of *incidental legal issues* in a foreclosure suit." 728 P.2d at 1365 (emphasis in original).

*Penmont Enter., Inc. v. Dysart*, 340 So.2d 1285 (Fla.Dist.Ct.App.1977), cited in the Court's opinion, is also contrary to *Steed I* because the Florida District Court of Appeals put the burden on the party seeking the jury trial to show "that the non-jury trial of the equitable issues in the cause prior to the jury trial of the legal issues presented by the counterclaim deprived the defendants of any legal right." 340 So.2d at 1286. In *Steed I*, the Court put the burden on the party presenting the equitable claim to show clearly that the equity claimant would suffer irreparable harm if there were a jury trial of the legal claim.

*Jaffe v. Albertson Co.*, 243 Cal.App.2d 592, 53 Cal.Rptr. 25 (1966), cited in the Court's opinion, also is contrary to the rationale of *Steed I*. It would allow the trial court by the exercise of its discretion to try the equitable claim first to abrogate the right to trial by jury guaranteed in *Steed I*.

In my view, on remand the trial court should assess the character of the counterclaims. Those that are legal in nature should be entitled to a jury trial in which

the jury is free to consider the factual issues free from any preemptive decision of the trial court in the equitable portion of the case.

## ON DENIAL OF REHEARING

BAKES, Chief Justice.

Two petitions for rehearing were filed in this matter, one by the limited guarantors, and the other a joint petition filed by Bliss Valley Foods and Mr. and Mrs. Erkins. Both petitions for rehearing are denied.

However, footnote 17 to the original opinion is withdrawn. We do not decide whether the "Assumption of Liability Agreements" or "Amended Assumption of Liability Agreements" signed by the limited partners were guaranties, or constituted agreements making these parties principal borrowers under the promissory notes. The trial court should make this determination on retrial in determining whether the affirmative defenses raised by the limited partners are to be resolved by the court as part of the equitable action of foreclosure, or by the jury as a separate legal claim against guarantors, giving due consideration to this Court's analysis in *David Steed & Associates v. Young*, 115 Idaho 247, 766 P.2d 717 (1988).

Additionally, we do not, by our action in Part V of the opinion in which we set aside the defamation award in favor of Robert Erkins because it was barred by the statute of limitations, intimate one way or the other whether or not on retrial Erkins may assert the defamation claim as an offset to the claims of the Idaho First National Bank. The offset issue was never raised below because the district court concluded that the statute of limitations had not run on the defamation claim contained in Erkins' amended counterclaim. Our opinion does not preclude Erkins from seeking to amend his answer to assert such a setoff claim.

BOYLE, J., and SCHROEDER and McKEE, JJ. Pro Tem., concur.

JOHNSON, Justice, concurring and dissenting.

I concur with the decision of the Court to deny the petition for rehearing of Bliss Valley Foods and the Erkins. I also concur with the portion of the opinion on denial of rehearing concerning part V (Defamation) of the Court's original opinion in this case.

I would, however, grant the limited guarantors' petition for rehearing for the reasons stated in my concurring and dissenting opinion issued with the original opinion in this case.

I also dissent from the decision of the Court to withdraw footnote 17. This footnote reads:

The equitable claim against the limited partners, in their capacity as limited partners, is limited to their investment interest in the limited partnership's assets. The bank's additional claims against the limited partners on their assumption of liability agreements and guaranties are legal claims, not equitable claims.

In my view, Idaho First's claims against the limited guarantors on the amended assumption of liability agreements and guaranties are clearly legal claims and cannot be construed to be equitable in nature. The amended assumption of liability agreements state that each of the limited guarantors "unconditionally assumes primary personal liability, without right of contribution from the Corporation or any other Shareholder thereof, to pay pursuant to the Notes." These agreements describe the nature of the limited guarantors' obligations as "independent of any other obligations of the Corporation, and a separate action or actions may be brought and prosecuted against the Shareholder whether action is brought against the Corporation or whether the Corporation is joined in any such action or actions."

Idaho First did not sue the limited guarantors to foreclose, but rather to collect the amounts the limited guarantors agreed to pay pursuant to the amended assumption of liability agreements and guaranties. These are legal, not equitable, claims.